John A. BAILEY, Plaintiff,

v.

**DART CONTAINER CORPORATION OF MICHIGAN, Defendant.**

**No. CIV. A. 94–10758–RCL.**

United States District Court, D. Massachusetts.

Aug. 29, 1997.

562

Erik P. Belt, Lee Carl Bromberg, Lisa M. Tittemore, Bromberg & Sunstein, Boston, MA, for Plaintiff.

Kenneth M. Reiss, R. Edward Brake, Robert A. Auchter, Julie Y. Patterson, Howrey & Simon, Washington, DC, Michael H. Shanahan, Banner & Allegretti, Ltd., Boston, MA, Dale A. Malone, Banner & Whitcoff, Boston, MA, Scott L. Robertson, Thomas J. Scott, Thomas Scott, Jr., Hunton & Williams, Washington, DC, for Defendant.

## ORDER

LINDSAY, District Judge.

Report and Recommendation accepted, except as to matter reconsidered in Report and Recommendation of March 12, 1997.

**REPORT AND RECOMMENDATION RE: DEFENDANT DART CONTAINER CORPORATION OF MICHIGAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON–INFRINGEMENT OF U.S. PATENT NO. 4,322,015 (DOCKET ENTRY # 5); DEFENDANT DART CONTAINER CORPORATION OF MICHIGAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON–INFRINGEMENT OF U.S. PATENT NO. 4,473,167 (DOCKET ENTRY # 7); PLAINTIFF BAILEY'S CROSS MOTION FOR PARTIAL SUMMARY**

**JUDGMENT OF INFRINGEMENT OF U.S. PATENT NOS. 4,322,015 AND 4,473,-167 (DOCKET ENTRY # 28) ORDER RE: PLAINTIFF BAILEY'S MOTION TO STRIKE PORTIONS OF THE FOX DECLARATION (DOCKET ENTRY # 76); PLAINTIFF BAILEY'S MOTION TO STRIKE PORTIONS OF THE MACKENZIE DECLARATION (DOCKET ENTRY # 30); PLAINTIFF BAILEY'S MOTION TO STRIKE SECOND MACKENZIE DECLARATION (DOCKET ENTRY # 55); DEFENDANT DART CONTAINER CORPORATION OF MICHIGAN'S MOTION FOR PROTECTIVE ORDER (DOCKET ENTRY # 20); PLAINTIFF'S CROSS–MOTION FOR ENTRY OF A PROTECTIVE ORDER (DOCKET ENTRY # 23)**

April 24, 1996

BOWLER, United States Magistrate Judge.

Plaintiff John A. Bailey ("Bailey"), owner of U.S. Patent Nos. 4,322,015 ("the '015 patent") and 4,473,167 ("the '167 patent"), filed this patent infringement action against defendant Dart Container Corporation of Michigan ("Dart"). Bailey contends that Dart's plastic container lids for its Lift n' Lock lids ("Dart's lids") infringe the '015 and '167 patents.[1] Pending before this court are three motions for partial summary judgment (Docket Entry # # 5, 7 & 28), three motions to strike (Docket Entry # # 30, 55 & 76) and two motions for protective orders (Docket Entry # # 20 & 23). After conducting a hearing, this court took the aforementioned motions under advisement.

I. *DEFENDANT DART CONTAINER CORPORATION OF MICHIGAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON–INFRINGEMENT OF U.S. PATENT NO. 4,322,015 (DOCKET ENTRY # 5)*

Dart moves for partial summary judgment on the basis that Dart's lids do not infringe

---

1. The Dart lids at issue come in two models, one with a straw slot and one without a straw slot. The differences between the models are not germane to the infringement issue. Although Dart produces other container lids, such lids lack the combination of a hinged access strip and a reclosable access portion claimed in the '015 and '167 patents. (Docket Entry # 49, ¶¶ 6 & 7).

the '015 patent literally or under the doctrine of equivalents. (Docket Entry # 5). In reply, Bailey filed an opposition and moved for partial summary judgment on the basis that Dart's lids infringe the '015 and '167 patents literally and under the doctrine of equivalents. (Docket Entry # # 28, 57 & 78).

In moving for partial summary judgment, Dart submits that Dart's lids lack the following features claimed in the '015 patent: (1) tear impressions extending inwardly from the edge of the container lid; (2) a retainer means; and (3) at least one protrusion opposite the access strip.

## A. Background

The '015 patent, entitled "Container Lid," issued to Bailey on March 30, 1982. Thereafter, on September 29, 1982, Bailey filed another, related patent application which issued as the '167 patent on September 25, 1984. The '167 patent, entitled "Container Lid Construction," is a continuation in part of the '015 patent. As such, the '167 patent claims certain matter already claimed in the '015 patent and adds other new matter.

Both patents relate to plastic container lids with rimengaging means and tear impressions extending inwardly from the edge of the container lid or the rim-engaging means. While the '015 patent claims a retainer means, the '167 patent claims new matter consisting of a self-forming hinge element for the access strip comprising a molded-in depression and a vertical depending straight wall bridging the interior ends of the tear impressions.

Claim 1 of the '015 patent and the description of the preferred embodiment of the invention in the specification describe a container lid consisting of a flat central portion adapted to nest within and below the rim of a container. The container lid also includes a "rim-engaging means around the periphery of the edge" of the container which secures the "lid to the container rim in [a] semilocking, manually releasable" arrangement. ('015 patent, col. 2, 1. 51–56; col. 5, 1. 15–20).

As previously noted, the primary areas of dispute for purposes of Dart's partial summary judgment motion with respect to the '015 patent concern the claimed tear impressions, the retainer means and the structure described therein of "at least one protrusion molded into the surface of the central portion of the lid opposite said access strip." Dart moves for partial summary judgment on the basis that these features do not exist in Dart's lids and, accordingly, there is neither literal infringement nor infringement through the doctrine of equivalents.

## B. Infringement Analysis: Literal and Equivalent

Summary judgment is proper "in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Johnston v. IVAC Corporation,* 885 F.2d 1574, 1576 (Fed.Cir. 1989). The inquiry is "'whether the evidence presents a sufficient disagreement to require submission to a jury [or this court as the fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1185 (Fed.Cir.1993).

For example, to prevail on summary judgment of noninfringement, Dart must "point out the absence of evidence in the record directed to proof of a matter on which [Bailey] bore the burden of proof and which was necessary to establish [his] case." *Becton Dickinson and Company v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990) (depicting summary judgment standard for alleged infringer under doctrine of equivalents analysis). Once Dart sets "forth facts upon which its motion is premised, [Bailey] must come forward with specific facts showing that a genuine issue for trial exists." *Sears, Roebuck and Company v. Sears Realty Company, Inc.,* 1993 WL 260677 at * 3 (N.D.N.Y. July 8, 1993).

Claim construction, for purposes of an infringement analysis, is an issue which this court may and should resolve as a matter of law. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, —— ——, 116 S.Ct. 1384, 1393–1396, 134 L.Ed.2d 577 (1996). "A literal infringement analysis requires two separate steps." *Southwall Technologies, Inc. v. Cardinal IG Company,* 54

F.3d 1570, 1575 (Fed.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). The first step is claim construction, *Morton International, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1468 (Fed.Cir. 1993), which this court determines as a matter of law. *Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d at 1575. As emphatically set forth by the Federal Circuit, the interpretation and the construction of the claims in a patent, "which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–971 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

Having determined what is patented, the second step is to compare the accused device to the properly construed claim. *Read Corporation v. Portec, Inc.,* 970 F.2d 816, 821 (Fed.Cir.1992); *accord Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1196 (Fed.Cir.1994) ("[s]econd, the claim as properly construed must be compared to the accused device"). In other words, "[t]he second step is to decide whether each limitation in the properly construed claim is found, either literally or equivalently, in the allegedly infringing" device. *Morton International, Inc. v. Cardinal Chemical Co.,* 5 F.3d at 1468. It is in the second step where material issues of fact often arise inasmuch as it is "the trier of fact [who] determines whether the claims as thus construed read on the accused product." *Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d at 1575.

■ Under the initial step of claim construction, the first inquiry is to examine the language of the claim which defines the scope of protection. *Bell Communications Research, Inc. v. Vitalink Communications Corporation,* 55 F.3d 615, 619 (Fed.Cir.1995). In reviewing the words of the claim, this court "ascribe[s] [to them] their ordinary meaning unless it appears the inventor used them otherwise." *Bell Communications Research, Inc. v. Vitalink Communications Corporation,* 55 F.3d at 620; *accord Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d at 1196 (unless specification or "file history indi-

cate that the inventor intended otherwise, a claim term will be accorded its ordinary and accustomed meaning"). The focus of the inquiry into the meaning of one or more terms in a claim is not on what the inventor subjectively intended the term to mean. Rather, the court examines "what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman v. Westview Instruments, Inc.,* 52 F.3d at 986.

■ Although the words used in a claim are important to interpret the meaning and the scope of the claim, the court must also consider the specification. *Markman v. Westview Instruments, Inc.,* 52 F.3d at 979 (court examines three sources for claim interpretation: the claims, specification and prosecution history). As cogently explained in *Markman,* the specification, which contains a description of the invention, operates "as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d at 979. It is, however, the function of the claims, rather than the specification, to define and to delimit the right to exclude. *Markman v. Westview Instruments, Inc.,* 52 F.3d at 980; *see In re Paulsen,* 30 F.3d 1475, 1480 (Fed.Cir.1994) (improper to add "extraneous limitation appearing in the specification" into the claims and noting that "extraneous" means "a limitation read into a claim from the specification wholly apart from the need to interpret particular words or phrases in the claim"); *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed.Cir. 1989) (extraneous limitations in the specification are not read into the claims). Consequently, particular drawings or "examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571 (Fed.Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *Specialty Composites v. Cabot Corporation,* 845 F.2d 981, 987 (Fed.Cir.1988) (same).

■ The prosecution history also serves to illuminate the meaning and scope of the claims. *Markman v. Westview Instruments, Inc.,* 52 F.3d at 980. Separate and apart

from the concept of prosecution history estoppel, statements made by the inventor during the application process may confirm and define a claim term.[2] *Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d at 1578. Like the specification, however, the prosecution history "cannot 'enlarge, diminish, or vary' the limitations in the claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d at 980 (citation omitted).

 In determining the meaning and the scope of a claim, this court may resort to extrinsic evidence, including expert testimony, in order to educate itself on the meaning of the language employed and to understand the relevant technology. *Markman v. Westview Instruments, Inc.,* 52 F.3d at 980–981. Nevertheless, such extrinsic evidence cannot vary the clear meaning of the terms in the claims. Instead, it provides background evidence which may assist this court in its task of assigning particular meanings to the claims at issue. *Markman v. Westview Instruments, Inc.,* 52 F.3d at 981. As explained by the Supreme Court in affirming the Federal Circuit in *Markman:*

> The decisionmaker vested with the task of construing the patent is in the better position to ascertain whether an expert's proposed definition fully comports with the specification and claims and so will preserve the patent's internal coherence. We accordingly think that there is sufficient reason to treat construction of terms of art like many other responsibilities that we ceded to a judge in the normal course of trial, notwithstanding its evidentiary underpinnings.

*Markman v. Westview Instruments, Inc.,* 517 U.S. at ——–——, 116 S.Ct. at 1395–1396 (1996). Where, as here, the experts disagree about the meaning of the terms in claim 1 of the '015 patent to one skilled in the art,[3] it is the clear meaning of the terms as established through the words employed, the specification and the prosecution history which controls. *See Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d at 1578. Such disputes among the experts do "not necessarily create a genuine issue of material fact." *Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d at 1578.

"To establish infringement, every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent." *Becton Dickinson and Company v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990); *Laitram Corporation v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991) (same); *accord Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.,* 983 F.2d 1039, 1043 n. 2 (Fed.Cir. 1993) (if "accused device lacks any limitation or an equivalent, it does not infringe the claim"). Thus, if a claim limitation set forth in claim 1 or its equivalent is missing from Dart's lids, there can be no infringement. *London v. Carson Pirie Scott & Company,* 946 F.2d 1534, 1539 (Fed.Cir.1991).

"The determination of no literal infringement does not end the infringement inquiry" where, as here, the moving party raises an equivalency argument. *Becton Dickinson and Company v. C.R. Bard, Inc.,* 922 F.2d at 797. The previous discussion regarding literal infringement is nevertheless germane to the determination of infringement under the doctrine of equivalents. Thus, limitations applicable to literal infringement may also apply under the doctrine of equivalents. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d 394, 398 (Fed.Cir.1994).

Similar to its recent pronunciation and clarification concerning claim interpretation in *Markman,* in August 1995 the Federal Circuit issued an important and extensive opinion on the doctrine of equivalents. *Hilton Davis Chemical Company v. Warner–*

---

**2.** In addition, with respect to Dart's motion for partial summary judgment on the '167 patent, it is worth noting that the prosecution history of the '015 patent may cast light on the meaning of terms in a claim in the '167 patent. *Jonsson v. Stanley Works,* 903 F.2d 812, 818 (Fed.Cir.1990) (prosecution history of common parent patent sheds light on terms used in continuation in part patents).

**3.** This opinion does not fully recite all the different interpretations accorded the terms in claim 1 by one skilled in the art at the time of the invention, according to Bailey's expert and Dart's experts. Nevertheless, this court has *fully* considered the testimony and opinions proffered by these experts.

*Jenkinson Company, Inc.,* 62 F.3d 1512 (Fed.Cir.), *opinion supplemented,* 64 F.3d 675 (Fed.Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). Rejecting the commonly used function/way/result test as the sole arbiter of equivalency,[4] the court held "that the application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard." *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1518. The function/way/result test remains viable, however, and "often suffices to assess equivalency because similarity of function, way, and result leaves little room for doubt that only insubstantial differences distinguish the accused product or process from the claims." *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1518.

■ The doctrine of equivalents operates as an equitable doctrine, *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1521 (explaining equity in light of doctrine as invoking questions of "general fairness"); *London v. Carson Pirie Scott & Company,* 946 F.2d at 1538, which expands the patentee's right to exclude from the marketplace an infringer who merely makes insubstantial changes to the claimed invention. *Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.,* 983 F.2d at 1043; *see, e.g., Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1261 (Fed.Cir.1989) (simply exchanging known, equivalent ingredient in order to avoid the literal language of a patent presents a "classic example" of the doctrine of equivalents). It involves a factual determination, *Intel Corporation v. United States International Trade Commission,* 946 F.2d 821, 832 (Fed.Cir.1991), wherein the court may examine several factors in assessing the substantiality or in substantiality of the differences between the accused product

and the claimed invention. *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1518. For instance, whether a person of ordinary skill in the art would have perceived "the interchangeability of the claimed and unclaimed elements is a factor in considering equivalence." *Perkin–Elmer Corporation v. Westinghouse Electric Corporation,* 822 F.2d at 1535; *accord Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1519. Similarly, the court may consider evidence of copying and designing around the claims. *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1519–1520.

■ Although the inquiry is factual, it is also objective "with proof of substantiality of the differences resting on objective evidence." *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1519. The "vantage point" for assessing substantiality is the perspective "of one of ordinary skill in the relevant art." *Hilton Davis Chemical Company v. Warner–Jenkinson Company, Inc.,* 62 F.3d at 1519. Finally, the doctrine of equivalents ordinarily is the exception and not the rule in an infringement analysis. *London v. Carson Pirie Scott & Company,* 946 F.2d at 1538.

With these precepts in mind, this court turns to the terms in claim 1 of the '015 patent which Dart maintains are lacking in Dart's lids, i.e., the claimed tear impressions, the retainer means and the structure described therein of "at least one protrusion molded into the surface of the central portion of the lid opposite said access strip."

### C. Tear Impressions

■ Dart raises a number of alleged differences between Dart's lids and the tear impressions claimed in claim 1 of the '015 patent. First, Dart argues that claim 1 requires that the tear impressions extend to the outer edge of the container and that the

---

4. The function/way/result test examines whether the accused product " 'performs substantially the same function in substantially the same way to obtain the same result' " as the claimed invention. *Becton Dickinson and Company v. C.R. Bard, Inc.,* 922 F.2d at 797 (quoting *Graver Tank*

*& Manufacturing Company v. Linde Air Products Company,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)); *Perkin–Elmer Corporation v. Westinghouse Electric Corporation,* 822 F.2d 1528, 1535 (Fed.Cir.1987) (same).

corresponding component in Dart's lids does not extend to the outer edge. Second, Dart submits that the term tear impressions only encompasses a pair of linear impressions on the surface of the container lid. Dart points out that the corresponding components of Dart's lids are not linear but rather comprise a series of corrugations with sawtooth shapes having wide outer ends and narrow inner ends. In addition, such corrugations, according to Dart, do not foster failure of the material along "predetermined lines" ('015 patent, col. 3, 1. 9), but, instead, foster failure of the material anywhere within the trapezoidal region formed by the sawtooth corrugations. Further, the sawtooth corrugations are not impressions inasmuch as they extend perpendicular to the direction of the tear. In contrast, according to Dart, the impressions described in the '015 patent run along the surface of the container lid and extend along the direction of the tear.

Claim 1 of the '015 patent[5] claims "a pair of spaced apart tear impressions extending inwardly from the edge of the container lid." ('015 patent, col. 5, 1. 22–23). Each tear impression terminates "at separate tear stop means." The tear impressions together with the tear stop means operate to define "a reclosable access strip having a self-forming hinge area." ('015 patent, col. 5, 1. 24–28). The entire subparagraph in claim 1 pertaining to tear impressions reads as follows:

a pair of spaced apart tear impressions extending inwardly from the edge of the container lid, each impression terminating at separate tear stop means therefor within said central portion thereof, said impressions and said tear stop means together defining a reclosable access strip having a self-forming hinge area affixing said access strip to said container lid.

('015 patent, col. 5, 1. 21–29).

The words "from the edge of the container lid" do not state from the outer edge of the container lid. Further, the words do not read or require that the tear impressions physically touch the edge of the container lid. The plain and ordinary meaning of such lan-

guage to one skilled in the art does not, necessarily, exclude extending inwardly from the inner edge of the container lid. Nor does the language and the word "from" necessarily exclude a tear impression spaced a short distance from the edge of the container lid. The language also does not describe the tear impressions as linear, perpendicular, straight, wide, narrow, of varying widths or following a predetermined line. Rather, the language concerning tear impressions in claim 1, as read by one skilled in the art, demonstrates that tear impressions simply extend inwardly from the edge and terminate at a tear stop means. For further guidance, therefore, this court turns to the specification and the prosecution history.

The specification describes tear impressions in the following manner:

In accordance with the invention, container lid (10) comprises a pair of spaced apart tear impressions (22) which extend inwardly from edge (20) and each of which impressions (22) terminate in tear stop means (24) located within central portion (12). It is the role of tear impressions (22) to foster failure of the polymeric material of construction along the predetermined lines defined thereby. Accordingly, said impressions (22) may each be molded, embossed or scored as a single continuous line into the surface of lid (10) (as shown in FIG. 1) or may each be performed as a plurality of spaced apart, relatively short impressions (23) (as shown in FIG. 3).

('015 patent, col. 3, 1. 3–14).

The drawings, figures 1 and 3, also depict the spaced apart tear impressions. The language describing the tear impressions in figures 1 and 3 show two embodiments. The language accompanying figure 1 discloses a single continuous line ('015 patent, col. 3, 1. 11–12) while the language describing figure 3 ('015 patent, col. 3, 1. 13–14) discloses a plurality of spaced apart, short impressions.

Figure 1 pictures a single, continuous line. Although the specification does not expressly describe the continuous line as a straight

**5.** The remaining claims in the '015 patent are dependent on claim 1 or claim 4. Claim 4 is dependent on claim 1. Hence, all of the claims of

the '015 patent include the claimed tear impressions.

line, the accompanying drawing illustrates a straight, uninterrupted line from the outer edge of the container to the tear stop means. Figure 3 mistakenly illustrates the "plurality of spaced apart, relatively short impressions" as a single, unbroken line ('015 patent, fig. 3, 23) which, using the same language ('167 patent, col. 3, 1. 27–28), the '167 patent correctly illustrates as a series of dashed lines. ('167 patent, fig. 3, 20).

Thus, the specification discloses two forms of tear impressions, one being a single, continuous line and the other being a plurality of spaced apart, relatively short impressions. Although the specification cannot redefine the terms of claim 1 of the '015 patent, it nevertheless may serve as a useful guide or dictionary to elaborate upon the meaning of the terms. Thus, the term tear impressions in claim 1, as disclosed in the claim and further defined in the specification to one skilled in the art, may encompass a series of short, spaced apart impressions running along, but nevertheless molded into, the surface of the container lid. In describing the plurality of spaced apart, relatively short impressions, the specification does not describe these impressions as nonperpendicular or as forming or limited to a particular shape other than being short and/or fostering the failure of the material along predetermined lines.[6]

In addition, the description accorded the plurality of spaced apart relatively short impressions leaves room for an interpretation of the impressions as having slight variations in width. Because a description in a specification does not define or delimit the claims to necessarily encompass only the description of the invention contained in the specification, the tear impressions claimed in the '015 patent may therefore reach and include a plurality of spaced apart impressions which have a slight degree of variation in width as interpreted by one skilled in the art.[7]

Furthermore, while the drawings illustrating the single continuous line and the plurality of spaced apart short impressions show a relatively straight line, the language in the specification and in claim 1 fails to limit the claimed tear impression to the formation of a straight line. *See, e.g., Specialty Composites v. Cabot Corporation,* 845 F.2d 981, 987 (Fed. Cir.1988) (noting that neither claims nor specification modified the term plasticizer as being external or internal and construed term to encompass either although examples in specification showed only external plasticizers). Moreover, spacing the relatively short tear impressions apart from one another leaves room for a slight differential in the straightness of the tear between the impressions. One skilled in the art would therefore interpret the claimed tear impressions to include a plurality of relatively short impressions which form a line which may have, at a minimum, a very slight variation in the straightness of the tear.

Turning to the meaning of the word edge in claim 1, the language reads that the tear impressions extend "inwardly from the edge of the container lid." ('015 patent, col. 5, 1. 22). The specification similarly states that the tear impressions "extend inwardly from edge (20)." ('015 patent, col. 3, 1. 5). The language of the specification and figures 2 and 4 clarify that edge (20) refers to the outer edge of the container lid. The specification illustrates and describes the rim-engaging means as having "an ascending wall element (14) and descending wall element (18)" with the descending wall element (18) pictured on the outer wall of the rim-engaging means in figures 2 and 4. The descending wall element (18) is further depicted as "projected *outwardly* [emphasis added] at its lower *extremity* [emphasis added] as shown as *edge 20* [emphasis added] thereof." ('015 patent, col. 2, 1. 60–62 & 68; col. 3, 1. 1–2). It is therefore apparent that to one skilled in the

---

**6.** Ordinarily, "impressions" are formed by pressing or applying an external force to produce a mold or figure. (Docket Entry # 60, Ex. 13).

**7.** This court limits this claim interpretation regarding width to the motion for partial summary judgment (Docket Entry # 5). Accordingly, this interpretation does not comprise part of the law of this case.

In the alternative, and assuming *arguendo* that the term tear impression does not allow for a literal interpretation encompassing a slight variation in the width of the tear impressions, the doctrine of equivalents would permit an insubstantial variation in the width of the tear impression.

art the word edge in claim 1, as elaborated upon but not delimited in the specification, refers to the outer edge of the container lid.[8]

The choice of the word "from" in claim 1 ('015 patent, col. 5, 1. 24), however, does not exclude allowance for a small space between the outer edge of the container lid and the first impression leading therefrom. As discussed above, the specification clarifies that the term tear impression may include a series of "spaced apart" ('015 patent, col. 3, 1. 13) impressions. Accordingly, a small space may separate the outer edge from the first impression leading inwardly therefrom. Correspondingly, a small space may therefore separate the outer edge from the beginning of the claimed tear impression, as interpreted by one skilled in the art.

Dart also relies on the language in the specification that the tear impressions tear along "predetermined lines." ('015 patent, col. 3, 1. 9). The pertinent language, however, exists in the specification and refers to the role of the tear impressions. Furthermore, the words in claim 1 are silent as to the demarcation of the tear impression as a predetermined line. This court therefore doubts whether a person skilled in the art reading this description of the role of the tear impressions as forming predetermined lines would also read this limitation into claim 1 to require that tear impressions must always form predetermined lines.[9]

Turning to the other disputed characteristics of Dart's lids, Bailey's expert attests that such lids have a pair of spaced apart tear impressions which extend inwardly from the edge of the container lid. Each tear impression ends at a separate tear stop means pictured as a straight bar molded into the lids. (Docket Entry # 59, ¶ 18 & Fig. 1, C). The drawings and physical exhibits of Dart's lids demonstrate that the tear impressions do not visibly extend to and touch the outer edge of the container lid.

Bailey's expert further describes Dart's lids as having two corrugated channels or pathways which this court finds correspond to the tear impressions in the '015 patent. According to Bailey's expert, each channel or pathway consists of a series of corrugations or impressions. (Docket Entry # 59, ¶ 17). Bailey's expert characterizes each corrugation in the corrugated pathways as constituting a relatively short impression. Further, not unlike the space between the impressions described in the '015 patent ('015 patent, col. 3, 1. 13–14), a narrow space separates each corrugation within the corrugated pathways. (Docket Entry # 59, ¶ 50). According to Bailey's expert, each corrugation acts to direct the tear in a forward, preordained direction along the channel of the corrugations.

As disclosed in claim 1, tear impressions do not necessarily touch the edge of the container lid. Rather, they lead inwardly from the outer edge of the container lid. Such tear impressions may include a plurality of spaced apart, relatively short impressions. As expressed and discussed above, such tear impressions extend from the outer edge and may have a space between the outer edge and the beginning of the tear impression. Stated otherwise, because the term tear impression may encompass a series of spaced apart impressions, the first impression may have a small space between it and the outer edge of the container lid.

Whether Dart's lids have such a small space between the outer edge of the container lid and the first corrugation in the corrugated pathways cannot be decided on summary judgment. Both Bailey's and Dart's

---

8. Likewise, with respect to claim 1 of the '167 patent ('167 patent, col. 4, 1. 50), the description in the specification of the tear impressions as extending inwardly from the edge (15) ('167 patent, col. 3, 1. 17), the further description in the specification of the edge (15) as part of the exterior descending wall element (13) ('167 patent, col. 3, 1. 10–11) of the rim engaging means (5) and the illustration of the edge (15) in figure 2 of the '167 patent all evidence that the edge referred to in claim 1 of the '167 patent denotes the outer edge of the container lid.

9. This court need not decide this issue, however, because assuming *arguendo* that claim 1 includes the limitation of a predetermined tear line, Bailey's expert opines that the accused product tears in this manner. (Docket Entry # 59, ¶ 50). Given the varying interpretations of the characteristics of the accused product (Docket Entry # 49, ¶ 31; see footnote number ten) summary judgment is improper.

experts disagree about the characteristics of Dart's lids. According to Dart's expert the sawtooth corrugations in Dart's lids lie one to two millimeters from the interior edge of the inverted channel of the circumferential boundary of the container lid. (Docket Entry # 49, ¶ 36).[10] Bailey's expert, however, states that the tear impressions in Dart's lids include the entirety of the corrugation channels and extend from the edge of the container lid. (Docket Entry # 59, ¶ 60).

With respect to the issue of a predetermined line, Dart's expert depicts the sawtooth corrugations as not fostering the failure of the material along a predetermined line. (Docket Entry # 49, ¶ 31).[11] Bailey's expert, however, proffers a markedly different interpretation of the characteristics of the tear in Dart's lids. (Docket Entry # 59, ¶ 50). Therefore, assuming *arguendo* for purposes of the motion for partial summary judgment only that claim 1 has such a limitation,[12] there is a material issue of fact as to whether Dart's lids fall within this limitation.

Dart's expert also attests that the sawtooth corrugations extend perpendicular to the direction of the tear. (Docket Entry # 49, ¶ 30).[13] Again, having construed the term tear impression to include slightly perpendicular impressions, there is a material issue of fact as to whether Dart's lids meet this limitation. Similarly, having construed the term tear impressions to permit a slight variation in width of the spaced apart impressions,[14] there is also a material issue of fact as to whether Dart's lids meet this limitation. In addition, whether the described sawtooth corrugations comprise impressions within the meaning of claim 1 is a materially disputed fact due to the differing descriptions of the corrugations given by Bailey's and Dart's experts.

In sum, in light of the differing factual descriptions of the accused product, summary judgment is improper with respect to whether Dart's lids lack the features of tear impressions extending inwardly from the outer edge of the container lid. Moreover, due to the different descriptions of Dart's lids in reference to the claims as construed above, partial summary judgment is also improper with respect to whether the differences between Dart's lids and the claimed "tear impressions extending inwardly from the edge of the container lid" ('015 patent, col. 5, 1. 22–23) are substantial. The corresponding tear impressions in Dart's lids are not altogether different from the claimed tear impressions in the '015 patent. The degree of the substantiality of the difference is an issue of fact given the present record before this court. Partial summary judgment under the doctrine of equivalents is therefore inappropriate.

### D. *Retainer Means and Structure Described Thereafter*

Dart initially assumes, without explanation, that the language "retainer means" in claim 1 of the '015 patent is expressed in a means plus function format and therefore subject to the confines of the sixth paragraph of 35 U.S.C. § 112 ("section 112, ¶ 6"). Dart also argues that the term "at least one *protrusion* [emphasis added]," when properly construed, does not include a vent cap and, in particular, does not cover the vent caps in Dart's lids. In addition, Dart submits that the words "*opposite* [emphasis added] said access strip" ('015 patent, col. 5, 1. 32) which describe one or more protrusions, when properly construed, do not describe or extend to cover centrally located vent caps which lie adjacent to the access strip. (Docket Entry # 46).

---

**10.** To the extent Bailey moves to strike (Docket Entry # 55) this paragraph of the second affidavit of Ralph W. MacKenzie ("MacKenzie") (Docket Entry # 49, ¶ 36) or paragraphs 30 and 31, the motion is denied. MacKenzie properly qualifies as an expert for purposes of the motion for partial summary judgment (Docket Entry # 5). He also adequately sets forth his reasoning with respect to paragraphs 30, 31 and 36. Finally, this court does not consider MacKenzie's tes-timony insofar as he opines about the reach of the terms in claim 1 of the '015 patent.

**11.** See footnote number ten.

**12.** See footnote number nine.

**13.** See footnote number ten.

**14.** See footnote number seven.

In reply, Bailey similarly fails to address in detail the issue of the applicability of section 112, ¶ 6 to the claimed retainer means. Instead, Bailey generally assumes that section 112, ¶ 6 does not apply to the retainer means language and therefore discusses the construction of the words in a manner different from Dart's construction.[15] (Docket Entry # # 49 & 78).

### 1. Applicability of Section 112, ¶ 6

▮ The last subparagraph of claim 1 of the '015 patent claims the following:

> retainer means comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip, said retainer means being shaped and located to capture and releasably maintain said access strip in the open position.

('015 patent, col. 5, 1. 30–35) (emphasis added). "Claim language can be written as a 'means plus function' element or a 'structural' element." Fairchild Semiconductor Corporation v. Nintendo Company, Ltd., 1994 WL 560607 at * 3 (W.D.Wash. Feb.14, 1994) (discussing section 112, ¶ 6), aff'd, 39 F.3d 1197 (Fed.Cir.1994). Accordingly, the preliminary inquiry requires determining whether the above quoted retainer means language describes a means for performing a function within the meaning of section 112, ¶ 6 or denotes a more straight forward, structural limitation.

Section 112, ¶ 6 allows an inventor to express an element in a claim as a means for performing a function without reciting the structure of the claimed element in the claim.[16] The doctrine operates as a kind of reverse doctrine of equivalents inasmuch as the structures or equivalent structures disclosed in the specification will be read into

the claimed means. See Johnston v. IVAC Corporation, 885 F.2d 1574, 1580 (Fed.Cir. 1989). In order for infringement to exist when a claim contains means plus function language, "an accused device must (1) perform the identical function recited in the means limitation and (2) perform that function using the structure disclosed in the specification or an equivalent structure." Carroll Touch, Inc. v. Electro Mechanical Systems, Inc., 15 F.3d 1573, 1578 (Fed.Cir.1993); accord King Instruments Corporation v. Perego, 65 F.3d 941, 945–946 (Fed.Cir.1995) (setting forth similar analysis and citing Valmont Industries, Inc. v. Reinke Manufacturing Company, 983 F.2d at 1042), petition for cert. filed, 64 U.S.L.W. 3625 (U.S. March 4, 1996) (No. 95–418).

The recitation of a function together with the word "means" in a claim does not necessarily require the application of section 112, ¶ 6. See, e.g., AMP, Inc. v. Fujitsu Microelectronics, Inc., 853 F.Supp. 808, 820–821 (M.D.Pa.1994) ("despite the use of the term 'means' and the subsequent description of function, neither Claim 5 nor Claim 9 contains 'means plus function' language"). Conversely, "The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6)." Laitram Corporation v. Rexnord, Inc., 939 F.2d 1533, 1536 (Fed.Cir.1991). According to the Federal Circuit in Laitram, because the recited structure only operated to further specify the function of the claimed means, it was not, strictly speaking, structural language. Hence, section 112, ¶ 6 applied.

In the case at bar, the structural language following the words retainer means is in and of itself structural in nature. The words "protrusion [emphasis added] molded into the surface of the central portion of the lid"

---

15. It is, of course, to Bailey's advantage to forego application of section 112, 1 6 to the retainer means language. Because a section 112, 1 6 construction operates to limit the words in a claim to the stated and equivalent structures disclosed in the specification which perform the identical function, see In re Bond, 910 F.2d 831, 833 (Fed.Cir.1990) (" 'section 112 ¶ 6 operates to cut back on the types of means which could literally satisfy the claim language' "), Bailey's construction achieves a broader reach for the retainer means language.

16. The statute reads as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

('015 patent, col. 5, 1. 30–33) exist independently and apart from the described function of the retainer means. *Cf. Fairchild Semiconductor Corporation v. Nintendo Company, Ltd.*, 1994 WL 560607 at * 4 (W.D.Wash. Feb.14, 1994) (finding means plus function language with the term "connector means," in part, because "the structure is not known without understanding its function"). The aforementioned words do not merely "further specify the function of [the] means," *Laitram Corporation v. Rexnord, Inc.*, 939 F.2d at 1536, which in this instance is "to capture and releasably maintain said access strip." ('015 patent, col. 5, 1. 33–35). Instead, they describe a structure, i.e., a protrusion and its location opposite said access strip. *See, e.g., ZMI Corporation v. Cardiac Resuscitator Corporation*, 844 F.2d 1576, 1581 (Fed.Cir. 1988).

To the extent there is any doubt, the prosecution history confirms that one skilled in the art would interpret the claims in this manner notwithstanding the language in the specification intimating the application of section 112, ¶ 6. ('015 patent, col. 4, 1. 4–20).[17] In October 1977 Bailey filed a continuation in part application which eventually issued as the '015 patent. The original application recited four application claims involving a retainer means, application claims 9 through 12.[18] Application claims 9 and 10 incorporated prior claims and simply included added language describing a retainer means albeit without the insertion of structural language.[19] Application claims 11 and 12, however, included a more specific and more structural description of the retainer means.[20]

The examiner rejected application claims 9 and 10 because it would have been obvious to employ the retainer teachings shown in a 1969 patent issued to John B. Nicholson ("Nicholson") (Docket Entry # 48, Ex. E) in the coffee cup lid claimed in a 1974 patent issued to James J. Serritella ("Serritella") (Docket Entry # 48, Ex. C) as modified by a 1968 patent issued to Henry M. Chang ("Chang") (Docket Entry # 48, Ex. D). The examiner did not, however, reject application claims 11 and 12 which, as previously noted, included the more specific, structural language describing the retainer means. Rather, the examiner objected to these application claims because they depended on previously rejected claims. He further stated that application claims 11 and 12 would be allowable if rewritten in independent form with the limitations of the parent claims. (Docket Entry # 60, Ex. 8).

In lieu of following the examiner's suggestion to rewrite application claims 11 and 12 in independent form, Bailey submitted a response. With respect to the issue of the retainer means, Bailey argued that Nicholson disclosed a retainer means for can tops with metallic tear strips which was inoperable in Bailey's resilient thin polymeric wares. Thereafter, however, the examiner reaffirmed his earlier decision to reject application claims 9 and 10 as unpatentable.[21]

---

**17.** The referenced language describes alternative means to capture and releasably maintain the access strip in its open position.

**18.** The original language in the specification remained essentially unchanged throughout the application process with respect to the description of the retainer means except for the substitution of "access strip" for the words "tear strip."

**19.** Application claim 9 claimed, "The container lid of Claim 1 including retainer means to capture and releasably maintain said tear strip in the open position." Application claim 10 recited, "The container lid of Claim 9 wherein said retainer means is integral therewith." (Docket Entry # 60, Ex. 8).

**20.** Application claim 11 claimed, "The container lid of Claim 9 wherein said retainer means comprises a pair of spaced apart protrusions molded into the surface of the central portion of the lid opposite said tear strip: said protrusions being spaced apart and shaped to capture and releaseably (sic) maintain said tear strip in the open position there between."

Application claim 12 recited, "The container lid of Claim 9 wherein said retainer means comprises the combination of a vent cap and at least one protrusion molded into the surface of the central portion of the lid, each said protrusion being spaced from said vent cap to define a trough there between, each said trough being located and being of a size and shape to capture and releaseably (sic) maintain said tear strip in the open position." (Docket Entry # 60, Ex. 8).

**21.** This court has considered that, in issuing a final rejection of application claims 13, 3 and 5, the examiner also explained that, "It would be obvious to employ the non-converging or non-intersecting tearing of Chang with the impressions of Serritella ... The score lines of Serritel-

Bailey appealed the rejection and, with respect to the retainer means language, repeated his argument that Nicholson only disclosed a retainer means operable for metallic tear strips. The examiner's answer asserted, in part, that the teaching of the Nicholson retainer applied to plastic as well as to metal. The Board of Appeals of the United States Patent and Trademark Office affirmed the examiner's rejection of application claims 9 and 10. In so doing, the board noted the following:

Claims 9 and 10 recite broadly means to capture and releasably maintain the closure in open position. The examiner has relied on the Nicholson disclosure for its protrusion 50 as a teaching of such expedient. As *broadly claimed* [emphasis added], we see no error in such position.

(Docket Entry # 60, Ex. 8).

After losing the appeal, Bailey canceled application claims 9 and 10 and added a new, independent claim denominated as application claim 15. In addition to claiming other matter, the retainer means described in application claim 15 read as follows:

retainer means comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip, said retainer means being shaped and located to capture and releasably maintain said access strip in the open position.

(Docket Entry # 60, Ex. 8). Application claims 11 and 12 containing the more specific, structural description of the retainer means, were made to depend from new application claim 15.[22]

It is significant that in remarks to the United States Patent and Trademark Office ("PTO"), Bailey described application claim 15 as a generic claim which avoided new matter but nevertheless taught the subject matter of application claims 11 and 12. Bailey's remarks read, in part, as follows:

Claim 15, presented herein, represents a careful compositing of the subject matter of Claims 13, 9, 11 and 12 in such manner as to,

at once: (1) avoid new matter; (2) provide a single independent claim *which is generic to allowable dependent Claims 11 and 12* [emphasis added]; and (3) teach that the subject matter of Claims 11 and 12 which the Examiner has previously held to patentably define over the prior art. Specifically, allowable dependent Claims 11 and 12 teach the retainer means as comprising *at least one molded* [emphasis in original] protrusion located on the *central* [emphasis in original] portion of the lid *opposite* [emphasis in original] the access strip. Each of the foregoing features and associations is explicitly recited in new independent Claim 15. Accordingly, Claims 11 and 12 have also been retained as *species* [emphasis added] claims depending from said Claim 15.

(Docket Entry # 60, Ex. 8).

In other words, Bailey again decided not to limit the new claims to independent versions of application claims 11 and 12, as earlier suggested by the examiner. Instead, Bailey decided to add a new claim, application claim 15, which he described as "generic" to application claims 11 and 12. He also characterized application claims 11 and 12 as "species claims" depending from application claim 15.

In patent nomenclature, a generic claim and claims restricted to species are terms of art:

Claims may be restricted to a single disclosed embodiment (i.e., a single species, and thus be designated a specific species claim), or a claim may include two or more of the disclosed embodiments within the breadth and scope of definition (and thus be designated a generic or genus claim) ... In general, a generic claim should include no material element additional to those recited in the species claims, and must comprehend within its confines the organization covered in each of the species.

*Manual of Patent Examining Procedure*, §§ 806.04(d) & 806.04(e) (5th ed., Rev.15, 1994); *see also In re Kroekel*, 803 F.2d 705, 707 (Fed.Cir.1986) (in separate patents, one patent may have "a broad or 'generic' claim

la are 'substantially through' the sheet." (Docket Entry # 60, Ex. 8).

22. Application claims 15, 11 and 12 eventually issued respectively as claims 1, 9 and 10 in the '015 patent.

which reads on' an invention defined by a narrower or more specific claim in another patent").

Consequently, in light of the rejection of the retainer means application claims which lacked the structural language (application claims 9 and 10) "as broadly claimed," Bailey framed an independent generic claim. In so doing, he imported three features from the nonobjectionable, retainer means application claims which had included structural language (application claims 11 and 12) and underlined the imported features for emphasis, to wit, "*at least one molded* protrusion located on the *central* portion of the lid *opposite* the access strip." Bailey then characterized application claims 11 and 12 as species claims emanating from new application claim 15. By emphasizing the structural components of the retainer means and the location of the retainer means opposite the access strip in the newly formed independent, generic claim, Bailey removed any doubt that the retainer means element in claim 1 of the '015 patent is not a means plus function clause.

The PTO issued a notice of allowance with respect to the applications claims as amended after appeal. Thereafter, on March 30, 1982, the '015 patent issued.

 As previously noted, Dart argues that the term "at least one *protrusion* [emphasis added]," when properly construed, does not include a vent cap. The common and ordinary meaning of the word protrusion to one skilled in the art, however, is something which protrudes. The verb protrude means to project or "to jut out from the surrounding surface." (Docket Entry # 60, Ex. 13). Furthermore, the common and ordinary meaning of the words "at least one" includes a retainer means comprised of only one protrusion. One skilled in the art would also understand that the term protrusion conceivably includes a structure which juts out from the surface of the container lid including the structure identified as a vent cap in Dart's lids.

The specification fails to demonstrate any special definition accorded the term protrusion. In other words, there is no indication in the specification that Bailey intended to attach an uncommon meaning to the term protrusion. See *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed.Cir.1992) (when "inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner in the patent disclosure"). The specification language cited by Dart ('015 patent, col. 4, 1. 15–16) does not explicitly define the term protrusion to exclude a vent cap. Rather, the sentence simply describes one of several embodiments of the retainer means wherein the retainer means is comprised of "the combination of molded-in vent cap (33) and a protrusion (32), each rising above the surface of central portion (12)." Claim 10 claims this more specific version of the retainer means.[23] Accordingly, Dart's construction of the terms "at least one protrusion" does not mandate partial summary judgment.

 Dart also asserts that the words "*opposite* [emphasis added] said access strip" ('015 patent, col. 5, 1. 32) do not describe or extend to cover centrally located vent caps which lie adjacent to the access strip. Claim 1 uses the words "opposite said access strip" to refer to the location of the one or more protrusions on the container lid which operate to releasably maintain the access strip in its open position. The more complete phrase claims "at least one protrusion molded into the *central* [emphasis added] portion of the lid opposite said access strip." The claimed protrusion is therefore located in the central portion of the container lid which lies opposite the access strip. Given the described location of Dart's vent cap as opposite the access strip by Bailey's expert (Docket Entry # 59, ¶¶ 24 & 69) and as adjacent to the access strip by Dart's expert (Docket Entry # 49, ¶ 9), there is a material issue of fact as to whether the so called vent cap in Dart's lids literally infringes the limitation in claim

---

23. The fact that claim 10 separates the term vent cap from the term protrusion does not, absent more specific language in the patent, inevitably require that a protrusion can never constitute a vent cap. Furthermore, the fact that Dart's lids may not infringe the retainer means in claim 10 does not lead to a conclusion that Dart's lids do not infringe the retainer means in claim 1.

that the centrally located protrusion[s] be "opposite said access strip." [24]

Dart also contends that because Bailey acquiesced to the rejection of application claim 9, he cannot now assert a broad scope to the retainer means disclosed in claim 1. The prosecution history, however, reflects that although Bailey canceled application claim 9, he also applied for a new claim, application claim 15, which he described as a composite of the subject matter taught in application claim 9 as well as three other application claims. Moreover, Bailey is not attempting to define the term retainer means as broadly as the language used in application claim 9.

Due to the different descriptions of the location of the vent cap and the way in which Dart's lids maintain the access strip in an open position, partial summary judgment is also improper with respect to whether the differences between Dart's lids and the retainer means in claim 1 are substantial.[25]

In sum, in light of the above discussion, it is appropriate to recommend denial of Dart's motion for partial summary judgment (Docket Entry # 5).

## II. DEFENDANT DART CONTAINER CORPORATION OF MICHIGAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON–INFRINGEMENT OF U.S. PATENT NO. 4,473,167 (DOCKET ENTRY # 7)

Dart moves for partial summary judgment on the grounds that Dart's lids do not infringe the '167 patent literally or under the doctrine of equivalents. (Docket Entry # 7). In seeking partial summary judgment, Dart submits that Dart's lids lack the following three features claimed in the '167 patent: (1) a pair of spaced apart tear impressions; (2) tear impressions which extend inwardly from

the rim-engaging means; and (3) a self-forming hinge element comprising a molded-in depression defining an essentially vertical wall bridging the interior ends of the tear impressions. (Docket Entry # 47). The law respecting literal infringement and infringement under the doctrine of equivalents need not be repeated. Accordingly, this court turns to the issue of claim interpretation, in light of the three limitations at issue, and addresses the first two asserted limitations together in the next section.

### A. Tear Impressions

Dart initially argues that the tear impressions claimed in claim 1 of the '167 patent, when properly construed, encompass linear impressions which extend inwardly from the outermost edge of the rim-engaging means in a predetermined line along the direction of the tear. Dart submits that Dart's lids are not linear impressions which extend along a predetermined line. Rather, the corresponding components in Dart's lids are the aforementioned series of sawtooth corrugations with trapezoidal shapes. As previously argued by Dart in connection with the '015 patent, Dart asserts that the sawtooth corrugations run perpendicular to the direction of the tear. According to Dart, these sawtooth corrugations foster failure anywhere within the trapezoidal region and, thus, do not tear in a predetermined line.

The relevant language at issue in claim 1 of the '167 patent and in the specification is similar to the language previously interpreted in connection with the tear impressions claimed in claim 1 of the '015 patent. For similar reasons, Dart's arguments are unavailing.

The language in claim 1 pertaining to tear impressions reads as follows:

24. For purposes of resolving the motion for partial summary judgment, therefore, this court need not further interpret the language "opposite said access strip" at this time. As noted in *Markman*, the court is obligated to pronounce the meaning of disputed language within a claim. However, "This ordinarily can be accomplished by the court in framing its charge to the jury." *Markman v. Westview Instruments, Inc.*, 52 F.3d at 981.

25. In making this finding this court has considered Dart's arguments about the prior art, its construction of Bailey's statements to the examiner describing new application claim 15 and the reasons for Bailey's insertion of the words "opposite said access strip" into application claim 15. (Docket Entry # 46).

a pair of spaced apart tear impressions extending inwardly from the edge of said rim-engaging means and terminating at spaced apart locations within said central portion, thereby to define there between an access strip.

('167 patent, col. 4, 1. 49–53). Such language does not elucidate the tear impressions as being linear, perpendicular or forming a predetermined line. Nor does the language designate the edge as the outer edge of the rim-engaging means.

As with the '015 patent which Dart asserts "includes the identical language used in the '015 patent to describe these impressions" (Docket Entry # 49, ¶ 29), the specification of the '167 patent describes two forms of tear impressions. One form consists of "a single continuous line" ('167 patent, col. 3, 1. 24–26) and the other form comprises "a plurality of spaced apart, relatively short impressions" ('167 patent, col. 3, 1. 27). Figure 1 depicts the former while figure 3 depicts the latter.

As interpreted by one skilled in the art, the term tear impressions may therefore include a series of spaced apart impressions. The specification does not denote these impressions as linear, as forming a particular shape or as fostering the failure of the material along a predetermined line. Spacing the impressions apart leaves room for a slight variation in the straightness and in the perpendicular nature of the tear, as interpreted by one skilled in the art. Moreover, Dart's reliance on language in the specification concerning the role of the tear impressions does not delimit the claimed tear impressions as always fostering a preordained tear.

Similar to the edge claimed in claim 1 of the '015 patent, the edge referred to in claim 1 of the '167 patent is the outer edge of the rim-engaging means.[26] Despite this interpretation, however, the use of the word from ('167 patent, col. 4, 1. 50) together with the description of tear impressions as including a series of spaced apart impressions ('167 patent, col. 3, 1. 27) allows for a small space to separate the outer edge of the rimengaging means from the first impression leading inwardly therefrom, as interpreted by one skilled in the art.

Bailey's expert attests to a description of Dart's lids which would literally fall within the scope of claim 1 as interpreted above. (Docket Entry # 59, ¶¶ 17, 18, 50, 51, 60 & 61). Having considered Dart's arguments and for reasons similar to those explained in greater detail in section I(C) *supra*,[27] partial summary judgment is inappropriate given the differing descriptions afforded the accused product, in particular, the averred description of the accused product by Bailey's expert.[28]

B. *Access Strip Bridging a Vertical Depending Wall*

■ Dart maintains that in Dart's lids the sawtooth corrugations do not run to or into the transverse linear grove. Rather, the sawtooth corrugations extend inwardly only as far as the two circular tear stops. These tear stops lie between the interior ends of the sawtooth corrugations and the transverse linear groove. The tear stops thereby separate the interior ends of the sawtooth corrugations from the transverse linear groove and prevent the interior ends of the sawtooth corrugations from running to or into the transverse linear groove. Dart therefore urges that in Dart's lids the vertical depending wall does not bridge the interior ends of the tear impressions as required in claim 1 of the '167 patent. Bailey maintains that claim 1 of the '167 patent does not require the

---

**26.** See footnote number eight.

**27.** Dart does not distinguish between the tear impressions claimed in claim 1 of the '015 patent and tear impressions claimed in the '167 patent in moving for partial summary judgment on the '167 patent. Indeed, the language describing the tear impressions is not materially different for purposes of addressing Dart's literal infringement argument vis-a-vis the claimed tear impressions. Consequently, although this court has considered all of Dart's arguments, it is unnecessary to provide as much detail as provided in section I(C) *supra*.

**28.** Accordingly, this court need not address the equivalency argument for purposes of resolving the motion for partial summary judgment.

interior ends of the tear impressions to touch or intersect the vertical depending wall.

Although the specification contains language wherein the tear impressions "can" run to or into the vertical depending wall, the language in claim 1 does not define or limit the claim in this manner. The pertinent language in claim 1 reads as follows:

a self-forming hinge element for said access strip comprising a molded-in depression on said central portion, said depression defining an essentially vertical depending straight wall bridging the interior ends of said tear impressions.

('167 patent, col. 4, 1. 53–58). To one skilled in the art, the self-forming hinge element is comprised of a molded-in depression. The depression then defines a vertical depending straight wall bridging the interior ends of the tear impressions.

Examining the term bridging, the ordinary meaning of bridging does not require that the component being bridged, i.e., the interior ends of the tear impressions, touch or physically intersect with the component doing the bridging, i.e., the vertical depending straight wall. Ordinarily, the term bridge simply means "a structure carrying a pathway or roadway over a depression or obstacle." (Docket Entry # 60, Ex. 13). Such a definition does not directly imply, let alone require, that the obstacle being bridged intersect the actual bridge. To create this implication, let alone this requirement, would necessitate more specific and particular language in the claim. For example, claim 1 could describe the vertical depending straight wall as "bridging and touching the interior ends of the tear impressions." Unfortunately for Dart, however, claim 1 does not contain such language but simply uses the term bridging.

Dart nevertheless argues that language in the specification requires this limitation. The referenced language reads as follows:

Said tear impressions (20) can each run to or into the material of the wall (33), thereby to assure rupture of the polymeric material of said wall (33) at the internal ends of impressions (20) upon tearing back of the access strip (25) to its open condition. ('167 patent, col. 3, 1. 40–44).

Such language, contained in the specification, cannot delimit the claim separate and apart from any need to further define and clarify the meaning of the term bridging. Furthermore, the language relied upon by Dart is not mandatory. In particular, the specification uses the word "can" rather than words such as "must" or "shall." One skilled in the art reading the self-forming hinge element in claim 1 together with the above quoted language in the specification and accompanying drawings would simply understand that the interior ends of the tear impressions can but do not have to physically touch the material of the vertical depending straight wall.

The prosecution history supports this interpretation. The '167 patent issued from application serial number 428,357 ("the '357 application") filed in September 1982. The '357 application was, in turn, a continuation in part of application serial number 363,892 ("the '892 application"). (Docket Entry # 60, Ex. 10). Similar but not identical to claim 1 in the '167 patent, application claim 1 in the '892 application recited, "a selfforming hinge element for said access strip and comprising a mold-in raised archway on said central portion, said archway running transversely of and bridging the interior ends of said tear impressions." (Docket Entry # 60, Ex. 9).

The examiner rejected application claim 1 in the '892 application as anticipated by a 1978 patent issued to Robert A. Schram ("Schram"). In distinguishing Schram in a subsequent amendment, Bailey emphasized, with underlining, that the score lines in Schram extend *"completely"* through both corrugations." As a contrast, Bailey pointed to language in the proposed specification and urged that in his invention the tear impressions "can run *'to or somewhat into'* the material of the archway element." After the examiner issued another rejection, Bailey submitted an amendment under Rule 1.116(b). Therein, Bailey added language to application claim 1 which expressly required that the interior ends of the tear impressions run to or somewhat into the archway materi-

al.[29] The examiner nevertheless again rejected the subsequent amendment thereby resulting in Bailey's abandonment of the '892 application. (Docket Entry # 60, Ex. 9).

Thereafter, Bailey filed the continuation in part application, the '357 application, which matured into the '167 patent. For present purposes it is significant that Bailey dropped the language in application claim 1 of the '892 application regarding the limitation that the interior ends of the tear impressions run "to or somewhat into the material of said archway." Instead, this language became part of the specification of the '167 patent with the nonmandatory words that the interior ends "can" run to or into the archway material.[30]

Consequently, Bailey initially added and then removed the language with respect to the interior ends of the tear impressions running to or somewhat into the archway material. One skilled in the art reading this prosecution history would therefore recognize that claim 1 does not include the limitation that the interior ends of the tear impressions run to or into the material of the wall. Such an interpretation is consistent with the language in the specification and, more importantly, the term bridging in claim 1 of the '167 patent.

 Having interpreted the self-forming hinge element as not requiring that the interior ends of the tear impressions touch or intersect the vertical depending straight wall, this court now turns to the characteristics of the accused device. As attested to by Bailey's expert, Dart's lids have a reclosable access strip with a self-forming hinge area which can affix the access strip to the container lid. (Docket Entry # 59, ¶ 19). Bailey's expert also avers that the hinge element has a transverse linear groove which consti-

tutes a molded-in depression and which defines an essentially vertical depending straight wall. (Docket Entry # 59, ¶ 20). According to Bailey's expert, the vertical depending straight wall operates to bridge the interior ends of the tear impressions also referred to as the sawtooth corrugation pathways. (Docket Entry # 59, ¶¶ 21 & 50).

Although Dart's expert avers, in part, that the interior ends of the sawtooth corrugations "are not bridged by the transverse linear groove between the access strip and the vent cap" (Docket Entry # 49, 1 38), such an opinion does not refute the material issues of fact created by the opinion of Bailey's expert as to the characteristics of the accused device. Partial summary judgment in Dart's favor under a literal infringement analysis on the basis of the self-forming hinge element is therefore improper. Consequently, it is unnecessary for this court to address Dart's argument that the doctrine of equivalents also does not bar partial summary judgment in its favor with respect to the self-forming hinge element. Dart's motion for partial summary judgment of noninfringement of the '167 patent is therefore unavailing.

## III. *PLAINTIFF BAILEY'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF U.S. PATENT NOS. 4,322,015 AND 4,473,167 (DOCKET ENTRY # 28)*

 Bailey moves for a partial summary judgment of infringement of Dart's lids with respect to the '015 and '167 patents. (Docket Entry # 28). The previous explanation of the law of literal infringement and infringe-

---

**29.** Application claim 1, as amended, then read:

a self-forming hinge element for said access strip, said element comprising a molded-in raised archway on said central portion, said archway running transversely of and bridging the interior ends of said tear impressions and each of said tear impressions running to or into the material of said archway.

(Docket Entry # 60, Ex. 9). Bailey further described the invention as requiring that the tear impressions end at or somewhat into the material. He explained the newly amended claimed invention as follows:

the presently claimed invention, in order to fulfill the stated objectives of defining a hinge point for the access strip and of beneficially elevating the hinge point to above the central portion of the lid *requires, inter alia,* that the tear impressions end *at or somewhat into* the material of construction of the recited bridging transverse archway element.

(Docket Entry # 60, Ex. 9) (emphasis in original).

**30.** Application claim 1 in the '357 application also omitted the use of the word archway.

ment under the doctrine of equivalents is fully applicable to the analysis of Bailey's partial summary judgment motion. First and foremost, under the second step of comparing the accused device to the properly construed claim[s], each and every limitation in a claim must be found "either literally or equivalently, in the allegedly infringing device," *Morton International, Inc. v. Cardinal Chemical, Co.*, 5 F.3d at 1468; accord *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d at 1259 (all elements rule requires that "each element of a claim or its substantial equivalent be found in the accused device"), in order for Bailey to prevail with a finding of infringement.

Among other arguments, Bailey raises the issue that Dart's lids literally infringe claim 1 of the '015 patent and claim 1 of the '167 patent because Dart's lids have the requisite "pair of spaced apart tear impressions extending inwardly from the edge of the container lid." [31] ('015 patent, col. 5, 1. 21–22). As previously interpreted, the edge referred to in claim 1 of the '015 patent and in claim 1 of the '167 patent means the outer edge of the container lid or the rim-engaging means.[32]

Dart's expert attests that Dart's sawtooth corrugations, at their outermost points, lie one to two millimeters from the inner circumferential boundary of the container lid or rim-engaging means. (Docket Entry # 49, ¶ 36; Docket Entry # 64, ¶¶ 10 & 29).[33] Thus, based on the calculations of Dart's expert, the distance from the outer edge of

the sawtooth corrugation pathways is greater than one to two millimeters. The exact length of the sawtooth corrugation pathways as well as the radius of the lid is not readily apparent from the record. Given the obligation to view the record in Dart's favor and having considered the opinion of Bailey's expert in this regard, a distance of more than one to two millimeters from the outer edge of the container lid or rimengaging means may fall outside the scope of tear impressions which extend inwardly "from the edge" of the container lid or the rim-engaging means within the meaning of claim 1 of the '015 and the '167 patents under a literal infringement analysis.

██ Bailey's attempt to avoid this finding by arguing that the faults on Dart's lids constitute part of the sawtooth corrugated pathways or tear impressions (Docket Entry # 59, ¶¶ 44 & 45; Docket Entry # 57) is misplaced.[34] The prosecution history reflects that Bailey interpreted the term impressions as excluding non-converging *"slits"* which "are not the structural equivalent of applicant's claimed *impressions."* (Docket Entry # 60, Ex. 8; underlining in original). In particular, in a July 1978 amendment to the application which eventually issued as the '015 patent, Bailey argued that the non-converging slits in Chang were not the structural equivalent of the impressions claimed in the application. In an attempt to distinguish the patent examiner's rejection of application claims 13, 3 and 5,[35] Bailey argued the following:

resolving Bailey's motion for partial summary judgment.

In addition, Bailey moves to strike the Fox declaration as well as the Mackenzie declaration. This court resolves the motions to strike to the extent this court relies upon a particular paragraph in either declaration. With respect to striking paragraph 36 of the MacKenzie declaration, see footnote number ten.

---

31. In claim 1 of the '167 patent the pair of spaced apart tear impressions extend inwardly from the edge of the "rim engaging means." ('167 patent, col. 4, 1. 50).

32. See footnote number eight.

33. In opposing Bailey's partial summary judgment motion, Dart relies on the declaration of one of its experts, Wayne M. Fox ("Fox") (Docket Entry # 66) and its statement of disputed material facts (Docket Entry # 64). (Docket Entry # 63). In turn, Dart's statement of disputed material facts cites and relies on several paragraphs of the declaration of its other expert, MacKenzie. (Docket Entry # 64). Accordingly, the declarations of Fox and of MacKenzie, to the extent cited in Dart's statement of disputed material facts, form part of the record for purposes of

34. In so finding, this court has considered dependent claim 3 of the '015 patent.

35. The patent examiner rejected application claims 13, 3 and 5 because it would have been obvious to employ the teaching of the non-converging impressions as taught in Chang in the device claimed in Serritella. (Docket Entry # 60, Ex. 8).

The Examiner asserts that Chang discloses non-converging *impressions*. This is simply not the case. Chang discloses non-converging *slits* (14) which are *continuous* and *complete* faults *through* the material of construction. The Chang *slits* are not the structural equivalent of applicant's claimed *impressions,* the latter being most definitely *not* complete and continuous faults through the material of construction. (Docket Entry # 60, Ex. 8; underlining in original). One skilled in the art reading this prosecution history would therefore not interpret the term impressions in claim 1 of the '015 or the '167 patents as including or beginning at faults on the outer edge of a container lid.[36]

In addition, Bailey's general assertion in a footnote that the doctrine of equivalents operates to alternatively achieve infringement (Docket Entry # 57, n. 4) is misplaced. Notwithstanding the brevity of this argument, it relies on "the combination of the faults" on Dart's lids which, together with other features in Dart's lids, operate to "foster failure along predetermined lines, from the faults at the edge of the lid to the tear stops." (Docket Entry # 57, n. 4). Prosecution history estoppel, however, precludes such an extension of the term impressions. By distinguishing the slits or faults in Chang from the impressions in the claimed invention, Bailey relinquished the ability to extend the scope of the '015 and the '167 patents to encompass impressions which include the structural equivalent of faults.

▮▮▮▮▮ Prosecution history estoppel operates to estop or limit "later expansion of the protection accorded by the claim to the patent owner under the doctrine of equivalents when the claims have been purposefully amended or distinguished over relevant prior art to give up scope." *Biodex Corporation v. Loredan Biomedical, Inc.,* 946 F.2d 850, 862 (Fed.Cir.1991), *cert. denied,* 504 U.S. 980, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992); *accord*

*Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d at 1579 ("prosecution history estoppel limits the range of equivalents available to patentee by preventing recapture of subject matter surrendered during prosecution of the patent"). In determining whether the inventor relinquished matter during the application process, the standard "is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Haynes International, Inc. v. Jessop Steel Company,* 8 F.3d 1573, 1577–1578 (Fed.Cir.1993). In this instance, a competitor is objectively and reasonably entitled to conclude that Bailey relinquished a scope of the '015 and the '167 patents which would encompass impressions which begin at a fault on the outer edge of the container lid.

Material issues of fact therefore exist as to whether the sawtooth corrugations in Dart's lids literally infringe claim 1 of the '015 and the '167 patents by having "tear *impressions* [emphasis added] extending inwardly *from* [emphasis added] the edge of the container lid" or the "rim-engaging means." In addition, whether one skilled in the art would view the differences between the sawtooth corrugated pathways in Dart's lids and the claimed tear impressions extending inwardly from the edge of the container lid or the rim-engaging means in the '015 and '167 patents as substantial is an issue of material fact dependent, in part, on the characteristics of Dart's lids. Partial summary judgment in Bailey's favor is therefore inappropriate.

In the alternative, whether the sawtooth corrugations in Dart's lids have only slight variations in width,[37] given the description of sawtooth corrugations by Dart's expert (Docket Entry # 66, ¶ 9), cannot be resolved on summary judgment. Furthermore, Dart's expert attests that the sawtooth corrugations foster failure of the material at anywhere

---

**36.** As previously discussed, statements made by the inventor during the application process may confirm or define a claim term. The same construction of the term impressions necessarily applies to the analysis of Dart's motions for partial summary judgment. In turn, the constructions afforded to the terms in claim 1 of the '015 and the '167 patents in the previous sections also apply to this court's analysis of Bailey's motion for partial summary judgment.

**37.** See footnote number seven.

within trapezoidal region. (Docket Entry # 49, ¶ 31;[38] Docket Entry # 64, ¶ 41). Consequently, whether the sawtooth corrugations fall within the literal or equivalent scope of the term tear impressions under the polymer chain orientation theory[39] or otherwise also cannot be resolved in Bailey's favor on summary judgment.

## IV. DEFENDANT DART CONTAINER CORPORATION OF MICHIGAN'S MOTION FOR PROTECTIVE ORDER (DOCKET ENTRY # 20); PLAINTIFF'S CROSS–MOTION FOR ENTRY OF A PROTECTIVE ORDER (DOCKET ENTRY # 23)

Pending before this court are the above styled cross motions for protective orders. (Docket Entry # # 20 & 23). Although the parties essentially agree on the majority of the language and the terms of a protective order, they cannot agree on allowing the disclosure of documents to certain individuals and, in particular, Dart's in house counsel and in house expert.

Bailey is concerned about the potential disclosure of the terms and conditions of his confidential license agreements as well as the documents related thereto including the accompanying royalty reports. Bailey also desires to prevent the disclosure of confidential technological information concerning the inventions claimed in the '015 and the '167 patents. Where, as here, the parties are business competitors, there is a greater need for confidentiality. Bailey additionally submits letters from his licensees which discuss their serious concerns about the disclosure of such confidential materials to Dart.

Accordingly, Bailey objects to the disclosure of confidential material to MacKenzie, Dart's in house expert on plastic container lids. Bailey points out that MacKenzie is employed by Dart. Bailey further objects to disclosing confidential material to Dart's in house counsel. Bailey particularly objects to allowing Dart's in house counsel the ability to review confidential royalty information and production pricing data.

On the other hand, Bailey agrees to permit Dart's outside counsel to access the confidential material. He also agrees to allow the disclosure of confidential material to Dart's experts subject to such individuals signing an affidavit agreeing to be bound by the terms of the protective order.

In moving for a protective order and in opposing Bailey's cross motion, Dart contends that any injury to Bailey is outweighed by the need for Dart to access relevant and material information in preparation for trial. Dart maintains that the disclosure of the information would not endanger Bailey's competitive position in the marketplace. Dart also alleges that the license agreements do not contain any technical or trade secret information. Dart further submits that even if such agreements contain confidential information, the terms of Dart's proposed protective order expressly guard against the use of the disclosed information for business purposes.

---

**38.** See footnote number ten.

**39.** Bailey additionally asserts that the sawtooth corrugated pathways in Dart's lids constitute tear impressions within the meaning of claim 1 of the '015 and claim 1 of the '167 patents. He bases this argument, in part, on an interpretation of the term tear impressions in the '015 patent and the '167 patent as constituting a line of polymer chain orientation. Although this court seriously doubts Bailey's interpretation of the term "tear impressions" as constituting a line of polymer chain orientation, it is not necessary to interpret this term in this manner at this time. Such an interpretation can, if necessary, be accomplished at the framing of the jury charge. See Markman v. Westview Instruments, Inc., 52 F.3d at 981; see also footnote number 23. Dart's lids, however, lack the features of polymer chain orientation, according to Dart's expert. In particular, to the extent any minor level of orientation exists in Dart's lids, such orientation is random and unpredictable in nature. (Docket Entry # 66, ¶ 16).

Although Bailey moves to strike paragraph 16 of the Fox declaration because it lacks a factual basis (Docket Entry # # 76 & 77), Fox attests that he was personally involved in the designing, testing and developing Dart's lids. He therefore has the requisite factual basis to testify about the characteristics of Dart's lids for purposes of summary judgment. This court expresses no opinion as to the admissibility of his opinions at trial which is best left for the trial judge to resolve.

Accordingly, partial summary judgment in Bailey's favor is also unavailing under the polymer chain orientation construction of the patents.

## DISCUSSION

 Rule 26(c)(7), Fed.R.Civ.P. ("Rule 26(c)(7)"), dictates that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." Bailey, as the party seeking protection and resisting the disclosure of relevant information, bears the burden of proving "good cause" by demonstrating a factual basis of potential harm. Fed.R.Civ.P. 27(c)(7); *see Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir.1986); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 789 (1st Cir.1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989).

The risk of competitive injury is particularly high when the opposing party is a business competitor. *See American Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 741 (Fed.Cir.1987) (collecting cases in which court presumes disclosure is more harmful to competitor); *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.*, 107 F.R.D. 288, 293 (D.Del. 1985) (presuming that disclosure of trade secret to party who is not competitor is less harmful). Thus, this court must generally weigh on the one hand the right of Dart to examine relevant evidence against the right of Bailey to protect his confidential data. *See, e.g., GTE Products Corp. v. Gee*, 112 F.R.D. 169, 172 (D.Mass.1986) (balancing risk of competitive injury against need for information); *Triangle Ink and Color Co. v. Sherwin–Williams Co.*, 61 F.R.D. 634, 636–637 (N.D.Ill.1974) (limiting access to confidential information to trial counsel and independent experts).

A protective order with the provision requiring in house counsel and experts to sign an affidavit agreeing to be bound by the terms of the order sufficiently protects Bailey's interests while allowing Dart access to relevant information. Dart agrees to limit access to one rather than two in house attorneys. MacKenzie has special expertise in the area of the development and the manufacture of plastic container lids and is familiar with the accused container lids at issue. (Docket Entry # 21). Moreover, Dart can better protect and control the use of confidential information in the hands of its in house counsel and experts as opposed to its outside counsel and experts. See, *e.g., E.I. duPont de Nemours and Company v. Phillips Petroleum Company*, 219 U.S.P.Q. 37, 39, 1982 WL 63780 (D.Del.1982). Bailey fails to demonstrate, by affidavit or other documentary evidence, that the harm resulting from disclosure under the terms of Dart's protective order, subject to the limitation of allowing access to one in house attorney and one in house expert, outweighs Dart's need for relevant information.[40]

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[41] that Dart's motions for partial summary judgment (Docket Entry # # 5 & 7) and Bailey's cross motion for partial summary judgment (Docket Entry # 28) be **DENIED.**

The motions to strike (Docket Entry # 30, 55 & 76) are **DENIED,** in part, and otherwise **MOOT.** Dart's motion for a protective order (Docket Entry # 20) is **ALLOWED** and Bailey's cross motion for a protective order (Docket Entry # 23) is **DENIED.**

---

**40.** Because the effectiveness of a protective order is somewhat problematic, *see In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1033 (8th Cir. 1991) (after the fact enforcement of protective order often ineffectual in trade secrets case), Bailey may apply to this court for supplemental protection and *demonstrate*, by affidavit or otherwise, the necessity for supplemental protection.

**41.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).