John A. BAILEY, Plaintiff,

v.

**DART CONTAINER CORPORATION OF MICHIGAN et al.,**
**Defendants.**

No. 94–10758–RCL.

United States District Court,
D. Massachusetts.

Aug. 17, 2001.

---

Erik P. Belt, Lee Carl Bromberg, Lisa M. Tittemore, Anne Longobucco, Bromberg & Sunstein, Boston, MA, for John A. Bailey, Plaintiffs.

Anthony S. Fioto, Goodwin Procter LLP, Boston, Kenneth M. Reiss, R. Edward Brake, Robert A. Auchter, Julie Y. Patterson, Howrey & Simon, Scott L. Robertson, Thomas J. Scott, Thomas J. Scott, Jr., Hunton & Williams, Washington, DC, Dale A. Malone, Michael H. Shanahan, Banner & Witcoff, Ltd., Boston, MA, for Dart Container Corporation of Michigan, Defendants.

## MEMORANDUM ON CONSTRUCTION OF CLAIMS

LINDSAY, District Judge.

This is a patent infringement action in which the plaintiff, John A. Bailey ("Bailey"), alleges that the defendants, Dart Container Corporation of Michigan, Dart Container Corporation, Dart Container Corporation of Pennsylvania, and Dart Container Corporation of Kentucky (collectively "Dart"), infringed Bailey's United States patents numbered 4,322,015 ("the '015 patent") and 4,473,167 ("the '167 patent"). Before a fact-finder can determine whether there has been infringement, I must first construe all of the patent claims to ascertain their meaning and scope as a matter of law. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In 1994, the parties moved for summary judgment concerning infringement of the patents. These motions were assigned to Magistrate Judge Marianne B. Bowler for a report and recommendation. On April 24, 1996, Magistrate Judge Bowler issued her report and recommendation, which, among other things, construed several of the disputed claim terms. I approved and adopted Magistrate Judge Bowler's recommendations. *See Bailey v.*

*Dart Container Corporation of Michigan,* 980 F.Supp. 560 (D.Mass.1997) (*Bailey I* ).[1]

On March 7, 2001, the defendants moved for *Markman* hearing to interpret disputed terms of the asserted patent claims before trial. (Docket No. 312). On May 29, 2001, I granted the motion. (Docket No. 391). I advised the parties "to concentrate their efforts in the *Markman* hearing on issues of claim construction that have not been previously resolved on motions for summary judgment." Order on Defendants' Motion For *Markman* Hearing and Other Matters p. 2 (Docket No. 391). I also noted that the court would "entertain evidence and argument as to a matter it has previously ruled on only if the proponent can show that that ruling 'is clearly erroneous and would work a manifest injustice.'" *Id.* (quoting *Flibotte v. Pennsylvania Truck Lines, Inc.,* 131 F.3d 21, 25 (1st Cir.1997)). I held a five-day *Markman* hearing beginning on June 11, 2001. Both parties briefed their proposed claim constructions and presented evidence in support of their respective contentions. After the hearing, both parties submitted supplemental briefs.

## DISCUSSION

There are two steps in a patent infringement analysis. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir. 1998) ("An infringement analysis involves two steps"). First, the meaning and scope of the patent claims alleged to be infringed must be determined. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This step is commonly referred to as "claim construction." Second, the accused device must be compared to the

properly construed clams to determine whether the device infringes the patent. *See Cybor,* 138 F.3d at 1454. The sole task now before me is the construction of the disputed claims of the '015 and the '167 patents. *See Markman,* 517 U.S. at 372, 116 S.Ct. 1384 ("We hold that the construction of a patent, including terms of art within its claims, is exclusively within the province of the court").

The Supreme Court has emphasized that the purpose of patent claims is to apprise the public of what is protected by a particular patent. *See Markman,* 517 U.S. at 373, 116 S.Ct. 1384 ("It has long been understood that a patent must describe the exact scope of an invention and its manufacture to 'secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them'") (quoting *McClain v. Ortmayer,* 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800 (1891)). *See also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed.Cir.1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention"). While the construction of the claims a of patent is closely akin to construing other written documents, such as contracts or statutes, special considerations apply to patent claim construction, based upon the need for the public, and other inventors, to know as precisely as possible the scope of a patentee's claimed invention. Therefore, the court must look first look to matters in the public record when construing claims of a patent. *See Burke, Inc. v. Bruno Independent Living Aids, Inc.,* 183 F.3d 1334, 1340 (Fed.Cir.1999) ("This court has

---

**1.** The magistrate judge issued a second report and recommendation on March 12, 1997, which I accepted in its entirety. *See Bailey v. Dart Container Corporation of Michigan,* 980 F.Supp. 584 (D.Mass.1997) (*Bailey II* ). The subject matter of that report and recommendation does not bear materially on the disputed claims now before the court.

held that the language of the claims, the specification and the prosecution history are principally involved in construing patent claims because these constitute the public record") (citing *Markman*, 52 F.3d at 976). In general, a court first looks to the language of the claim, the written description portion of the specification, including any relevant drawings, and the prosecution history. *See Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1414 (Fed.Cir.2000). In order to aid the court's understanding of the patent, extrinsic evidence may be consulted if needed. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir.1996). However, "[t]he court turns to extrinsic evidence only when the intrinsic evidence is insufficient to establish the clear meaning of the asserted claim." *Zodiac Pool*, 206 F.3d at 1414. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make the right of the public to be on notice of the patent's limitations meaningless. *See Vitronics*, 90 F.3d at 1583.

■ The words of the claims themselves, used to define the scope of the patented invention, are the starting point of claim construction. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir. 1995) ("[R]esort must be had in the first instance to the words of the claim") (quoting *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984)). "[A] court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir. 1999). Indeed, plain English words are entitled to their plain English meaning, *see In re Wright*, 866 F.2d 422, 425 (Fed.Cir.

1989), unless it is apparent form the patent specifications and prosecution history that the inventor used a term with a different meaning. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir.1996). In short, while terms used in a patent generally should be construed to have the ordinary meaning they had at the time of the patent application, a patentee is still entitled to "choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582 (citing *Hoechst Celanese*, 78 F.3d at 1578). In those circumstances where the patentee's meaning is clear, the court must adopt the special definition of the term.

■ Thus, second, it is always necessary to read the patent claims "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification is "highly relevant to the claim construction analysis," *Vitronics*, 90 F.3d at 1582, because it contains "a written description of the invention . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use [the invention]." 35 U.S.C. § 112, ¶ 1. Therefore, the court should consider carefully the written description portion of the patent specification to discern any special meaning that the patentee gave to any terms found in the patent's claim. The specification operates "as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. However, the specification "does not delimit the right to exclude. That is the function and purpose of claims." *Id.* at 980.

An exception to the general rules regarding specifications applies when an element in a claim employs means-plus-function language. Means-plus-function

elements are defined by 35 U.S.C. § 112, ¶ 6. That section provides:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

In effect, § 112, ¶ 6 allows a patentee to state claims in broad, general language by stating the "function" of the invention, rather than reciting the detailed structures or materials that perform the claimed function. Means-plus-function clauses, being devoid of the details of structure capable of satisfying the recitation of function, are the broadest or most generalized recitation of that structure. As such, means-plus-function language is an economical way of expressing the more complex structures covered by the claim.

■ While a means-plus-function clause literally calls for any means capable of performing the indicated functions, the statute itself precludes such breadth. Instead, the statute limits a "means-plus-function" expression to the "means" actually disclosed in the specification and equivalents thereof. *See Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed.Cir. 1998) ("[I]n writing a claim in means-plus-function form, a party is limited to the corresponding structure disclosed in the specification and its equivalents"); *Personalized Media Communcations, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed.Cir.1998) ("[Section] 112, ¶ 6 operates to restrict claim limitations drafted in such functional language to those structures, materials, or acts disclosed in the specification (and their equivalents) that perform the claimed function"). Thus, the "cost" of using means-plus-function language is that the scope of the claim is restricted to the particular structures disclosed in the specification and their equivalents.

■ Third, the court may consider the prosecution history of the patent. This history includes a "complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582. Thus, the prosecution history is often of critical significance in determining the meaning of the claims, *see Vitronics*, 90 F.3d at 1582, because it "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed.Cir.1995). Although the prosecution history can, and should, be used to understand the language of the claims, it too cannot "enlarge, diminish, or vary" the limitations in the claims. *Markman*, 52 F.3d at 980.

■ Finally, the court may consider extrinsic evidence only where necessary to resolve any persisting ambiguities after the intrinsic evidence has been analyzed *See Vitronics*, 90 F.3d at 1583. Thus, "where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Id.* There are exceptions to the general rule disfavoring extrinsic evidence. A court may consult technical treatises and dictionaries in order to "better understand the underlying technology." *Id.* at 1584 n. 6. The court may rely on dictionary definitions to construe claim terms only "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the

patent documents." *Id.*[2]

Here, Bailey has accused Dart of infringing claims 1, 2, 3, 5, 6 and 7 of the '015 patent, and claims 1, 3 and 7 of the '167 patent. Not all of the claim elements, however, are in dispute. Therefore, I will construe only those claims plainly in dispute.

### THE '015 PATENT

The '015 patent describes a disposable container lid that is primarily used with beverage containers. The lid is secured to the top of a container and an access strip is pulled back from the rim of the lid along tear impressions to create access to the contents. The access strip is capable of being held open and also can be reclosed to avoid spillage. Although Bailey alleges Dart infringes six of the ten claims of the '015 patent, the last five of those claims are dependent of claim 1. Thus, I will limit my analysis to claim 1 of the '015 patent. That claim provides:

A container lid composed of a resilient thin polymeric sheet material and comprising:

*a central portion adapted to nest within and below the rim of a container* and rim-engaging means around the entire periphery of the lid, said rim-engaging means being adapted to secure said lid to the container rim in semi-locking, manually releasable relationship therewith;

*a pair of spaced apart tear impressions extending inwardly from the edge of the container lid,* each impression terminating at separate tear stop means therefor within said central portion thereof, said impressions and said tear stop means together defining a reclosable access strip having a self-forming hinge area

affixing said access strip to said container lid;

*and retainer means comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip,* said retainer means being shaped and located to capture and releasably maintain said access strip in the open position.

'015 patent, col. 5, 1. 14–35 (emphasis added). The language critical to this dispute has been emphasized.

### A. "a central portion adapted to nest within and below the rim of a container."

■ The parties agree that the central portion is the section of "relatively flat," plastic material that is bounded by the rim-engaging means, and which nests "below the rim of a container." '015 patent, col 2, 1. 50–52. The sole dispute between the parties with respect to this claim element is whether all of the structures found upon the central portion also must nest "within and below" the horizontal plane formed by the rim of the container. Bailey suggests that the central portion is, in effect, the platform for other structures of the claimed container lid. Therefore, the structures that are found on the central portion are not required to be lower in height than the rim of the container. Dart, on the other hand, argues that a person of the ordinary skill in the art would interpret "the central portion" to be an amalgam of the relatively flat portion bounded by the rim engaging means and any structures molded-into or rising from that relatively flat surface. Therefore, Dart claims that all the structures on the central portion, such as a vent cap and any

---

**2.** Some extrinsic material may never be considered. For example, claims must be construed *without* reference to the accused device. *See SRI International v. Matsushita Electric Corp. of America,* 775 F.2d 1107, 1118 (Fed.Cir.1985).

protrusions, must sit below the horizontal plane formed by the rim of the container. As evidence, Dart points to the language of the claim which states that the central portion nests "below the rim of a container." Moreover, Dart suggests that the illustrations in the '015 patent confirm its interpretation. Dart's argument is unavailing.

A person of ordinary skill in the art[3] would not construe the '015 patent to require that all of the structures on the central portion to nest "below the rim of a container." The '015 patent makes clear that the "central portion" is a different structure from the structures found on it, specifically either a "protrusion" or a "vent cap." *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed.Cir.2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings"). Thus, the limitations assigned to "the central portion" in the '015 patent do not apply to those structures simply because those structures are attached to or molded-into the central portion.

The point is made obvious when one considers the other limitation in the '015 patent, namely that the central portion be "relatively flat." Dart concedes that the central portion must be "relatively flat." *See* Defendants' Post *Markman* Hearing Memorandum of Law Regarding Claim Construction p. 1. However, Dart wisely does not press a construction that would require structures found on the central portion to be "relatively flat." The reason for the inconsistency in Dart's position is

obvious. It would simply strain common sense to argue that "protrusions" found on the central portion should also be "relatively flat." Clearly, the '015 patent does not require "protrusions," which by definition jut out from the central portion, to take a "relatively flat" form. In fact, Dart concedes that the magistrate judge correctly defined protrusion as a structure that "jut[s] out from the surrounding surface." *See Bailey I*, 980 F.Supp. at 575. *See also* Defendants' Post *Markman* Hearing Memorandum of Law Regarding Claim Construction p. 20. Thus, it is evident that the '015 patent, as interpreted by one skilled in the art, does not require "protrusions" and "vent caps" to meet the "relatively flat" limitation placed upon the central portion. By the same logic, structures found on the central portion are not required to "nest within and below the rim of a container."

To the extent that there is any doubt, the specification supports the construction that the claim term "a central portion adapted to nest within and below the rim of a container" does not restrict the height of other structures found on the central portion. Figure 2 of the '015 patent shows in cross-section one preferred embodiment of the patented lid. Simply taking a ruler or other straight edge and extending a line from the top of structures comprising the retainer means out across the lid shows that each such protrusion rises above the rim of the container. Accordingly, in this embodiment, the protrusion is not limited in height. It does not need to sit entirely below the rim of the cup. The same can be seen in Figure 4 of

---

**3.** The "art" in this case is the mechanical design, molding and production of plastic lids. Tr. 3, p. 87, 1. 10–11; Tr. 2, p. 3, 1. 23–25. One skilled in the art is someone with a bachelors degree in mechanical or manufacturing engineering and two years of practical experience or someone with less formal education, such as an associates degree in plastics technology, with five or six years of practical experience. Tr. 3, p. 87, 1. 18–25; Tr. 2, p. 4–5, 1. 17–25, 1–7.

the '015 patent, which shows another preferred embodiment. Both protrusions rise slightly above the rim of the cup. As a matter of law, an interpretation of a claim that would exclude a preferred embodiment of the patent, such as the preferred embodiments depicted in the schematic drawings, "is rarely, if ever, correct." *Vitronics,* 90 F.3d at 1583.

### B. "a pair of spaced apart tear impressions extending inwardly from the edge of the container lid."

The parties vigorously dispute the proper construction of the '015 patent claim element "a pair of spaced apart tear impressions extending inwardly form the edge of the container lid." Tear impressions in the '015 patent may appear in two basic forms, one being a single, continuous line and the other being a plurality of spaced-apart, relatively short impressions. '015 patent, col. 3, 1. 10–14. Aside from the two basic forms of the tear impressions, the parties agree on several other characteristics of the tear impressions. For example, the parties do not contest the magistrate judge's conclusion that the description of the tear impressions allows for a slight degree in variation in the width of the impressions in the case of a plurality of spaced-apart impressions. *See Bailey I,* 980 F.Supp. at 569. Nor do the parties dispute the ruling of the Federal Circuit that the tear impressions must be "physical, visible features on the patented lids . . . and are not inherent characteristics of the thermoformed plastic." *Bailey v. Dunkin Donuts, Inc.,* 135 F.3d 775 (Fed. Cir.1998), 1998 WL 4726 at *2 (restating the finding of the lower court and affirming) (unpublished decision). While the

magistrate judge also concluded that the tear impressions allow for a very slight variation in the straightness of the tear, the parties agree that the '015 patent describes "tear impressions" in the context of the lid before it is open, and not qualities of the "tears" after the lid has been opened. Tr. 3, p. 62, 1. 15–25. Although the width and spacing of the impressions will undoubtedly affect the performance of the tears, the straightness of the tears is not relevant to claim construction. At the heart of the dispute are two features: (1) the width and/or shape of the tear impressions and, (2) the meaning of the term "edge."

I begin with the language of claim 1 itself. "[T]he language concerning tear impressions in claim 1, as read by one skilled in the art, demonstrates that tear impressions simply extend inwardly from the edge and terminate at a tear stop means." *See Bailey I,* 980 F.Supp. at 568. Thus, the language of the claim is wholly silent on the physical characteristics of the tear impressions aside from their positioning. For further guidance, therefore, I turn to the specification and prosecution history.

The specification states that the role of the tear impressions is to foster failure of the plastic material "along the predetermined lines defined thereby. Accordingly, said impressions may each be molded, embossed or scored as a single continuous line into the surface of lid (as shown in Fig. 1) or may each be performed as a plurality of spaced apart, relatively short impressions." [4] The drawings, figures 1 and 3, depict the tear impressions. Figure 1 pictures a single, uninterrupted, straight line from the outer edge of the container to the tear stop means. Figure 3 mistak-

---

**4.** I pause to note that the '167 patent specification similarly provides that the function of the tear impressions is "to preordain and direct the tearing failure of the polymeric material of construction along the pathways defined thereby."

enly illustrates the "plurality of spaced apart, relatively short impressions" as a continuous line. The '167 patent, however, correctly illustrates the language as a series of dashed lines. *See Bailey I*, 980 F.Supp. at 568–569.

As expected, the parties have starkly differing interpretations of the language in the specification. Dart argues that the specification sets the parameters for the tear impression structures. The tear impressions are both described in the specification as linear and in all instances are illustrated as linear. Dart contends that if the tear impressions could be any size or shape, then they would not foster the failure of the plastic material "along the predetermined lines defined thereby." By contrast, Bailey contends that the specification sets no limit on the size, shape, or width of the tear impressions, so long as the tear does not go astray and an access strip is formed. Neither party relies heavily on the prosecution history, and my review of that history does not reveal any matters material to the characteristics of the tear impressions. Bailey's view is illustrated in exhibit 26, which depicts wide, rectangular impressions. Bailey's expert, Dr. Steven S. Grossman, agreed on cross-examination that wide, rectangular impressions could meet the requirements of the '015 patent, provided that an access strip is formed once the lid is torn open and the tears do not go astray. I asked Dr. Grossman if there was any limitation on the width of the impressions. He responded:

THE WITNESS: No. I think the width again is not limited. They can have a width to them. They are not limited, again, to a sliver. They can have a width there so that they create a pathway for tear. So they do not have to have a specific width limited to a certain dimension. In fact -

THE COURT: At some point, though, the dimension can be so wide that you don't have a path.

THE WITNESS: Then the tear would go astray and they wouldn't work as a tear impression.

*See* Tr. 2, p. 37–38, ln. 22–25, 1–6. Dart's expert, Dr. David M. Parks, by contrast, opined that the impressions could be bold or thin, but qualified his statement with the limitation that the impressions retain their essential function of fostering failure *along predetermined lines.* Tr. 3, p. 120, ln. 21 (emphasis added).

I begin with the obvious observation that all tear impressions necessarily have some width. But how wide is too wide? Bailey's position that the tear impressions can be any width, so long as the tear does not go astray and an access strip is formed is dubious, at best. To interpret the patent in such a fashion wholly ignores the language in the specification that states the purpose of the "tear impressions" is to "foster failure ... along predetermined lines defined thereby." Moreover, the only way for one skilled in the art to determine whether a tear impression is too wide is to tear the lid and see if the tear goes astray. In essence, Bailey's position is that a tear impression that functions properly, namely one that it does not allow the tear to go astray, is disclosed in the '015 patent. Such a construction is simply not consistent with the motion that the tear impressions define and predetermine a line, and is so broad that, were it taken as the proper statement of the scope of the term "tear impression" in the '015 patent, it would render that patent vulnerable to public notice attacks. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1303 (Fed.Cir.1999) ("[T]he district court erred by importing the functions of a working device into these specific claims, rather than reading the claims for their

meaning independent of any working embodiment") (citing *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1278 (Fed. Cir.1995) ("[T]he district court erred by importing unnecessary functional limitations into the claim")). Consideration of the public notice function of the patent laws reinforces the conclusion that Bailey's proposed construction of the '015 patent should not be adopted.

■ I conclude that one skilled in the art would construe the term "tear impressions" as stated in the '015 patent to be physical, visible features on the lid, that may have some variation in width, and must predetermine and define a line in the context of a lid before it is torn open. A "line" is very narrow in proportion to its length, and can be straight or curved. The line formed by the tear impressions necessarily has some width, although the tear impressions cannot be so wide that they lose their essential characteristic of predetermining and defining a line.[5]

■ The parties next dispute the meaning of the term "edge" in the claim element requiring that the "tear impressions" extend "inwardly from the edge of the container lid." After reviewing all the evidence presented at the hearing on the matter, I now reaffirm my previous adoption of the magistrate judge's conclusion:

The language of the specification and figures 2 and 4 clarify that edge (20) refers to the outer edge of the container lid. The specification illustrates and describes the rim-engaging means as having 'an ascending wall element (14) and descending wall element (18)' with the descending wall element (18) pictured on the outer wall of the rim-engaging

means in figures 2 and 4. The descending wall element (18) is further depicted as 'projected *outwardly* at its lower *extremity* as shown as *edge 20* thereof.' ('015 patent, col. 2, l. 60–62 & 68; col. 3, l. 1–2). It is therefore apparent that to one skilled in the art the word edge in claim 1, as elaborated upon but not delimited in the specification, refers to the outer edge of the container lid.

The choice of the word 'from' in claim 1 ('015 patent, col. 5, l. 24), however, does not exclude allowance for a small space between the outer edge of the container lid and the first impression leading therefrom. As discussed above, the specification clarifies that the term tear impression may include a series of 'spaced apart' ('015 patent, col. 3, l. 13) impressions. Accordingly, a small space may separate the outer edge from the first impression leading inwardly therefrom. Correspondingly, a small space may therefore separate the outer edge from the beginning of the claimed tear impression, as interpreted by one skilled in the art.

*Bailey I*, 980 F.Supp. at 569–570 (emphasis supplied).

Therefore, in the case of a single continuous line, the tear impression must begin at the outer edge and travel inwardly to the tear stop means. When the tear impression consists of a plurality of spaced-apart, relatively short impressions, the parties agree that a small space separating the outer edge from the first impression may be appropriate. See Tr. 5, p. 30, l. 5–6. Such a space must be small enough that the tear impression retains its essen-

---

**5.** In addition, the description in the specification accorded the plurality of spaced-apart relatively short impressions also leaves room for an interpretation that the impressions can vary in shape. For example, the impressions need not be dashes or dots, but could take the form of a variety of shapes, so long as the shapes maintain the essential characteristic of defining a line.

tial feature of "extending inwardly from the [outer] edge of the container lid."[6]

### C. "and retainer means comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip"

■■■■ Claim 1 of the '015 patent recites a "retainer means comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip." The parties have raised the issue of whether this element should be construed as a means-plus-function element under 35 U.S.C. § 112 ¶ 6. The Federal Circuit has examined § 112 ¶ 6 in several cases and has established guidelines for determining its applicability. In deciding whether a claim limitation is a means-plus-function limitation, the "use of the word 'means' creates a presumption that § 112, ¶ 6 applies." *Personalized Media*, 161 F.3d at 703. However, a limitation that uses the word "means," but does not recite a function that corresponds to the means, does not invoke § 112, ¶ 6. *See Rodime PLC*, 174 F.3d at 1302. Likewise, even when a limitation does recite a function, if it also recites sufficiently definite structure for performing that function, then § 112, ¶ 6 does not apply. *See id.*

■■■■ Here, the "retainer means" limitation uses the word "means" and therefore is presumed to invoke § 112, ¶ 6. Moreover, the claim language recites the corresponding function of "being shaped and located to capture and releasably maintain said access strip in the open position." However, the claim does recite some structure for performing the claimed function. Claim 1 states that the "retainer means" comprises "at least one protrusion molded into the surface of the central portion of

the lid opposite said access strip." The magistrate judge concluded that one skilled in the art would understand the term "at least one protrusion molded into the surface of the central portion of the lid opposite said access strip" to connote sufficiently definite structure to rebut the presumption that § 112, ¶ 6 applies. *See Bailey I*, 980 F.Supp. at 572–73. The question now raised is whether my acceptance and adoption of the magistrate judge's decision to depart from the presumption that § 112, ¶ 6 applies was clearly erroneous.

I look to the case law for guidance. In *Cole v. Kimberly–Clark Corp.*, the Federal Circuit interpreted the following claim phrase involving removable training pants for toilet training toddlers: "perforation means extending from the leg band means to the waist band means through the outer impermeable layer means for tearing the outer impermeable layer means for removing the training brief in case of an accident by the user." 102 F.3d 524, 531 (Fed.Cir. 1996). The Federal Circuit held that the quoted clause failed to satisfy § 112, ¶ 6 because it described the structure supporting the tearing function (i.e.perforations) and because it describes the location (extending from the leg band to the waist band) and extent (extending through the outer impermeable layer) of the structure *Id.* The Federal Circuit concluded that "[a]n element with such a detailed recitation of its structure, as opposed to its function, cannot meet the requirements of the statute." *Id.* Similarly, in *Rodime PLC*, the court held that the claim element "positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk" fell outside of the means-plus-function format because the claim went on to provided

---

**6.** Nothing in the claim construction above precludes faulting of the polymeric sheet material at the end of each tear impression at the outer edge, as described in claim 3.

a detailed description of the structure, its location and its interconnection with the structural sub-elements. 174 F.3d at 1303–04. Likewise, in *Envirco Corp. v. Clestra Cleanroom, Inc.*, the Federal Circuit held that because the term "baffle" in the "baffle means" element connotes some degree of structure and the claim provided additional details as to the location and formation of the structure, the § 112, ¶ 6 presumption was overcome. 209 F.3d 1360, 1365 (Fed.Cir.2000). *See also AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F.Supp. 808, 820 (M.D.Pa.1994) (interpreting "bus solder tail means" to fall outside means-plus-function format because the words "bus solder tail" described a specific structure).

Not every recitation of structure, however, removes the claim element from the means-plus-function format. For example, the Federal Circuit held that the claim phrase "spring means tending to keep the door closed" is insufficient structural language to take the limitation out of the ambit of the construction dictate of § 112, ¶ 6. *See Unidynamics Corp. v. Automatic Products International, Ltd.*, 157 F.3d 1311, 1319 (Fed.Cir.1998). The court held that the word "spring" was the only recitation of structure in the claim and alone could not rebut the presumption created by the word "means." *See also Nilssen v. Motorola, Inc.*, 80 F.Supp.2d 921, 928 (N.D.Ill.2000) (term "source means having AC terminals and being operative to provide AC voltage thereat" did not recite sufficient structure to remove claim from the presumed ambit of § 112, ¶ 6); *Loral Fairchild Corp. v. Victor Company of Japan, Ltd.*, 906 F.Supp. 798, 808 (E.D.N.Y. 1995) (holding the term "sink charge means" and additional claim language identifying the location of the sink charge means do not provide sufficient structure to overcome the presumption). Moreover, when the recited structure sets forth only what the recited means *does*, rather than what it *is* structurally, the claim is properly interpreted under § 112, ¶ 6. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed.Cir.1991) ("The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6) [when it] merely serves to further specify the function of that means").

Upon consideration of the case law, I determine that "retainer means" element recites sufficient structure to overcome the presumption that § 112, ¶ 6 applies. The words of the claim, "comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip," state with sufficient specificity the structure (at least one protrusion molded into the surface) as well as the location of the structure (central portion of the lid opposite said access strip). Based on the Federal Circuit's decisions in *Cole* and *Envirco Corp.*, I conclude "[a]n element with such a detailed recitation of its structure, as opposed to its function, cannot meet the requirements of the statute." *Cole*, 102 F.3d at 531.

Because the "retainer means" element does not qualify for § 112, ¶ 6 treatment, it is not limited to the structure corresponding to the claimed function as "described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. Instead, I will construe the claims pursuant to standard claim construction rules.

■ The thrust of the dispute between the parties is the construction of the claim element "at least one protrusion." Bailey contends that "at least one protrusion," to one skilled in the art, simply means what it says, specifically one or more structures that protrude. Dart, on the other hand, contends that the term "at least one protrusion," when properly construed, means

at least one protrusion, excluding a vent cap, and some other structure.

At first blush, the term "at least one protrusion" would appear to have a plain and straightforward meaning. "The common and ordinary meaning of the word protrusion to one skilled in the art ... is something which protrudes. The verb protrude means to project or 'to jut out from the surrounding surface'. Furthermore, the common and ordinary meaning of the words 'at least one' includes a retainer means comprised of only one protrusion.'" *Bailey I*, 980 F.Supp. at 575. The magistrate judge found no indication that Bailey intended to accord any special meaning to the claim element. After reviewing the matter again, I withdraw my previous acceptance of the magistrate judge's conclusion on this point.

The claims and specifications of the patent indicate that the term "protrusion" has a more narrow meaning than the meaning assigned to it by the magistrate judge. *See Vitronics*, 90 F.3d at 1582 ("[I]t is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning"). The magistrate judge determined that the term "protrusion" includes all structures that "jut out from the surrounding surface." *Bailey I*, 980 F.Supp. at 575. Such a definition would also include "vent caps." However, the use of the word "protrusion" throughout the patent claims and specifications demonstrates that a "protrusion" is a distinct structure from a "vent cap."

First, the word "protrusion" is used in contradistinction to the term "vent cap" in the claims of the '015 patent. It is axiomatic that "[a] word or phrase used consistently throughout a patent claim should be interpreted consistently." *See CAE Screenplates Inc.*, 224 F.3d at 1317 (quoting *Phonometrics, Inc. v. Northern Tele-*

*com, Inc.*, 133 F.3d 1459, 1465 (Fed.Cir. 1998)). In addition to claim 1, the word "protrusion" appears in dependent claims 9 and 10. Claim 9 states:

> The container lid of claim 1 wherein said retainer means comprises *a pair of spaced apart protrusions* molded into the surface of the central portion of the lid opposite said access strip; said protrusions being spaced and shaped to capture and releasably maintain said access strip in the open position therebetween.

'015 patent, col. 6 (emphasis added). Claim 10 states:

> The container lid of claim 1 wherein said retainer means comprises *the combination of a vent cap and at least one protrusion* molded into the surface of the central portion of the lid, *each said protrusion being spaced from the said vent cap* to define a trough therebetween, each said trough being located and being of a size and shape to capture and releasably maintain said access strip in the open position.

'015 patent, col. 6 (emphasis added). While claim 9 does not mention the term "vent cap," claim 10 does. The latter describes a retainer means comprising "at least one protrusion" and a "vent cap." Here, in context, it seems plain that a "protrusion" is a distinct structure from a "vent cap." If a "vent cap" were merely a structure included in the more generic category of "protrusions," then such a relationship would be best expressed by denoting a "vent cap" and "at least one *other* protrusion." Put simply, the interpretation of "protrusion" advanced by Bailey in claim 1, in which a "vent cap" is a type of "protrusion," when applied to claim 10 would render that claim superfluous with respect to claim 9. *See Mycogen Plant Science v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed.Cir.2001) ("To the extent that

the absence of [a] difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant") (quoting *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed.Cir. 1987)).

Similarly, the specifications consistently distinguish between a "protrusion" and a "vent cap." The first embodiment of the retainer means is disclosed in figures 1 and 2 of the '015 patent. The specification recites that in those embodiments the "retainer means (30) comprises the combination of molded-in vent cap (33) and a protrusion (32), each rising above the surface of the central portion (12)." '015 patent, col. 4, l. 13–16. While this confirms the distinction between the structures "molded-in vent cap (33)" and "protrusion (32)," it also emphasizes that "*each* rises above the surface of the central portion" (emphasis added). In other words, the '015 patent recognizes that not all structures that rise above the central portion are "protrusions." Thus, one skilled in the art would construe the '015 patent to create two distinct structures, namely a "vent cap" and a "protrusion," even if they share the feature of rising above the surface of the container lid.

Having determined that "at least one protrusion" does not include a "vent cap," I next turn to the question of whether the term "at least one" means that Bailey has claimed a retainer means comprising *only* one protrusion, or whether the retainer means element, in fact, requires "at least one protrusion" and some other structure in addition. Again, the term standing alone suggests that a retainer means con-

sisting of only one protrusion is claimed by the '015 patent. *See Bailey I*, 980 F.Supp. at 575 ("[T]he common and ordinary meaning of the words 'at least one' includes a retainer means comprised of only one protrusion"). However, at the hearing on this matter the parties presented experts who offered vastly different opinions concerning the manner in which this element would be interpreted by one skilled in the art. Interestingly, however, both experts relied on much of the same prosecution history in reaching their opposite conclusions. After re-examining the matter, including a more probing examination of the prosecution history of the '015 patent, I conclude that one skilled in the art would understand the retainer means of claim 1 to require "at least one protrusion," *and some additional structure.*

The prosecution history of the '015 patent began on January 6, 1975, when Bailey filed his original patent application ('535 application). Exhibit 4, p. C1. That application did not contain a "retainer means" element.[7] All seven claims of the '535 application were rejected for both lack of novelty, 35 U.S.C. § 102, and obviousness, 35 U.S.C. § 103. Exhibit 4, p. C10–C11.

On January 7, 1976, Bailey filed the '212 application, which was a continuation-in-part application of the '535 application. Exhibit 5, p. D1. The purpose of a continuation-in-part is to permit an applicant to add new information and data to his/her application, while retaining the benefit of the earlier filing date for what was in the original application. *See Waldemar Link, GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed.Cir.1994) ("A [continuation-in-part] application can be entitled to different priority dates for different claims.

---

7. Claim 1 of the '535 application mentions a "vent hold." After reviewing all the evidence presented, I conclude that one of the ordinary skill in the art would understand the word "hold" to be a typographical error, and that the intended term was "vent hole." The specification of the '535 application discuss a "vent hole," and the figures depict the "hole."

Claims containing any matter introduced in the [continuation-in-part] are accorded the filing date of the [continuation-in-part] application. However, matter disclosed in the parent application is entitled to the benefit of the filing date of the parent application"). *See also* Manual of Patent Examining Procedure § 201.08 (6th Ed., Rev.3, 1997) ("A continuation-in-part is an application filed during the lifetime of an earlier nonprovisional application by the same applicant, repeating some substantial portion or all of the earlier nonprovisional application and *adding matter not disclosed* in the said earlier nonprovisional application") (emphasis in the original). Comparison of the '535 application with the '212 application reveals the new matter that Bailey added in the '212 application consisted of descriptions and drawings of a retainer means. Claims 9 through 12 related to the new retainer means disclosure of the '212 application. Exhibit 5, p. D17–D18. Those claims state:

9. The container lid of Claim 1 including retainer means to capture and releaseably maintain said tear strip in the open position.

10. The container lid of Claim 9 wherein said retainer means in integral therewith.

11. The container lid of Claim 9 wherein said retainer means comprises a pair of spaced apart protrusions molded into the surface of the central portion of the lid opposite aid tear strip; said protrusions being spaced and shaped to capture and releaseably maintain said tear strip in the open position therebetween.

12. The container lid of Claim 9 wherein said retainer means comprises the combination of a vent cap and at least one protrusion molded into the surface of the central portion of the lid, each said protrusion being

spaced from said vent cap to define a trough therebetween, each said trough being located and being of a size and shape to capture and releaseably maintain said tear strip in the open position.

*Id.* Claim 9 recites a generic retainer means in means-plus-function format. Claim 10 adds that the retainer means is "integral therewith." Claim 11 recites a retainer means with a "pair of spaced apart protrusions." Claim 12 discloses a retainer means comprising a "vent cap and at least one protrusion." The '212 application does not disclose a retainer means comprising only one protrusion. The patent examiner rejected claims 1 through 10 for lack of novelty. Exhibit 5, p. D31. The only claims not rejected by the examiner were claims 11 and 12. Although the examiner did not reject claims 11 and 12, he did not allow them as stated either. Rather, the examiner objected to claims 11 and 12 and explained that they "would be allowed if rewritten in independent form containing all the limitations of the parent claims." Exhibit 5, p. D31. In other words, claims 11 and 12, which recited retainer means comprising at least one protrusion and either another protrusion or a vent cap, were allowable if written as independent claims and not dependent from rejected claim 9. On or about August 10, 1977, Bailey filed an amendment to the '212 application following its final rejection. Exhibit 5, p. D50. He amended claims 1 and 7 (neither pertained to a retainer means), although he argued that all of claims of the '212 were valid. On September 9, 1977, the patent examiner rejected Bailey's amended application. Exhibit 5, p. D60.

On October 5, 1977, Bailey filed his '445 application, which was a continuation of the '212 application. Exhibit 6, p. El. Although there may be some variation in the

scope of the claimed subject matter, a continuation application is based solely on the disclosure of a parent application. *See* Manual of Patent Examining Procedure § 201.07 (6th Ed., Rev.3, 1997) ("The disclosure presented in the continuation must be the same as that of the original application; i.e., the continuation should not include anything which would constitute new matter if inserted in the original application"). By definition, a continuation application adds *no new matter*. More specifically, the '445 application did not recite any additional retainer means element. Indeed, comparison of the '212 application to the '445 application reveals that Bailey did not add any material to the '445 application. On August 9, 1978, the examiner rejected all the claims in the '445 application, except claims 11 and 12, the same retainer means claims to which the examiner objected in the '212 application. Exhibit 6, p. E49–E50. Again, neither claim 11 nor 12 recited a retainer means with *only one* protrusion. On or about September 15, 1978, Bailey appealed the final rejection of the '445 application to the Patent Board of Appeals (the "Board"). Exhibit 6, p. E52. The Board, however, sustained the examiner's position. Exhibit 6, p. E87. With respect to the rejected claims 9 and 10, which recited a retainer means in means-plus-function format, the Board wrote:

Claims 9 and 10 recite broadly retainer means to capture and releasably maintain the closure in open position. The examiner has relied on the Nicholson disclosure for its protrusion 50 as a teaching of such expedient. As broadly claimed, we see no error in such position.

Exhibit 6, p E89. On October 9, 1981, in response to the decision of the Board, Bailey filed an amendment to his '445 application. Exhibit 6, p. E92. In his amendment, Bailey cancelled claims 13, 9, and 10 of the '445 application. In their stead, Bailey wrote a new claim 15, which eventually became claim 1 of the '015 patent. It is of particular significance that, in remarks to the Patent and Trademark Office, Bailey described claim 15 of the '445 application as follows:

Claim 15, presented herein, represents a careful compositing of the subject matter of Claims 13, 9, 11 and 12 in such manner as to, at once: (1) avoid new matter; (2) provide a single independent claim which is generic to allowable dependent Claims 11 and 12; and (3) teach that subject matter of Claims 11 and 12 which the Examiner has previously held to patentably define over the prior art. Specifically, allowable dependent Claims 11 and 12 teach the retainer means as comprising *at least one molded* protrusion located on the *central* portion of the lid *opposite* the access strip. Each of the foregoing features and associations is explicitly recited in new independent Claim 15. Accordingly, Claims 11 and 12 have also been retained as species claims depending from said Claim 15.

Exhibit 6, E94 (emphasis in the original). On March 30, 1982, the '015 patent issued based on the amended '435 application.

Bailey now claims that the new claim 15 in his amendment to the '445 application claims a retainer means with *only* one protrusion. For support, he relies upon the language of the claim, which allows for a retainer means comprising "at least one protrusion." In light of the prosecution history, however, Bailey's position is wholly unsupported. First, Bailey represented to the Patent and Trademark Office that in compositing claims 13, 9, 11 and 12 of the '445 application, he "avoid[ed] new matter." *See also* 35 U.S.C. § 132 ("No amendment shall introduce new matter into the disclosure of the invention"). "New matter" is matter that is a departure

from or an addition to the original disclosure. *See* Manual of Patent Examining Procedure § 706.0(*o*) (6th Ed., Rev.3, 1997); *Stearn v. Superior Distributing Co.*, 674 F.2d 539, 544 (6th Cir.1982). As noted several times above, none of the claims composited in claim 15 (claims 13, 9, 11 and 12) disclose a retainer means with only one protrusion. Claim 13 recites no retainer means element at all. Claim 9 recites a generic retainer means in means-plus-function format (i.e. no structure recited). Claim 11 recites a retainer means with a "pair of spaced apart protrusions." Claim 12 discloses a retainer means comprising a "vent cap and at least one protrusion." Indeed, Bailey never disclosed a retainer means with only one protrusion in any of his patent applications leading up to the issuance of the '015 patent. Therefore, a retainer means element consisting of only one protrusion would be new matter in the disclosure of the '445 application. Because Bailey represented to the examiner that he was avoiding new matter, Bailey's claim 15 could not have included a retainer means with only one protrusion. So what did Bailey mean when he wrote "at least one protrusion" if he did not mean "one or more protrusions?" For the answer, I venture further into the thicket.

Bailey also asserted to the examiner that claim 15 was "generic" to claims 11 and 12. It is well-established that a claim may be broadened by generalizing the description of structure. *See* Manual of Patent Examining Procedure § 806.04(d) (6th ed., Rev.3, 1997). While a generic claim bears some resemblance to a means-plus-function claim, in that they both allow a patentee to assert broad claims, the two are not equivalent. *See Enercon GmbH v.*

*International Trade Comm'n*, 151 F.3d 1376, 1384–85 (Fed.Cir.1998) (generic claim terms should not be limited to the example disclosed in the specification absent clear redefinition of the claim term by patentee). Instead, generic claims allow all claims of species that meet the limitations of the generic claim. *See* Manual of Patent Examining Procedure § 806.04(d) (6th ed., Rev.3, 1997). One common way of expressing a generic claim is to identify an element common to the several species claims. *See id.* ("[Generic claim] may define only an element ... common to the several species"). Here, when Bailey represented that claim 15 was "generic" to claims 11 and 12, he was attempting to find a way of expressing those claims in a form common to both. The sole feature common to both claims 11 and 12 is one protrusion. The feature that claim 11 and 12 do not share is the structure used in combination with one protrusion to form a retainer means. Claim 11 uses another protrusion, while claim 12 uses a vent cap. However, neither of the species claims contain only one protrusion. A generic claim, therefore, cannot recite a retainer means consisting of only one protrusion. Thus, the only possible conclusion is that Bailey did not claim only one protrusion, but instead generically claimed retainer means comprising "at least one protrusion" and some other structure.[8] By asserting that his claim 15 was generic to claims for retainer means comprising at least two structures, Bailey cannot now disavow that "at least one protrusion" means a retainer means with "at least one protrusion" and some additional structure. *See Southwall Techs.*, 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude

8. Moreover, Bailey represented to the Patent and Trademark Office that claim 15 teaches the subject matter of claims 11 and 12. Again, claim 15 teaches the subject matter of

claims 11 and 12 only if the claim is construed to exclude a single protrusion retainer means.

any interpretation of claim terms that was disclaimed during prosecution").

### THE '167 PATENT

The '167 patent, like the '015 patent, describes a disposable container lid that is primarily used with beverage containers. The '167 patent is an "improvement" patent. "The '167 patent discloses an improved self-forming hinge element for the access strip and an improved retainer construction for holding the access strip open to allow drinking." *See Bailey,* 1998 WL 4726 *1 (Fed.Cir.1998). The '167 patent has nine claims, but not all of them are asserted against Dart. Claim 1 is the only independent claim of the '167 patent. It reads as follows:

> 1. In a container lid of the type composed of a thin, resilient, thermoplastic polymeric sheet material and comprising a central portion of a size and shape to overlie the open end of a container, a rim-engaging means integral with the periphery of said central portion and being adapted to releasably secure the lid to the rim of a container and a pair of spaced apart tear impressions extending inwardly from the edge of said rim-engaging means and terminating at spaced apart locations within said central portion, thereby to define therebetween an access strip, the improvement which comprises: a self-forming hinge element for said access strip comprising a molded-in depression on said central portion, *said depression defining an essentially vertical depending straight wall bridging the interior ends of said tear impressions.*

'167 patent, col. 4, lns. 43–58 (emphasis added). The critical language has been emphasized.

The claim language "essentially vertical depending straight wall" is not in dispute. The Federal Circuit has previously con-strued "essentially vertical" as "vertical or a few degrees from vertical." *See Bailey v. Dunkin Donuts, Inc.,* 1998 WL 4726 at *4. Moreover, the parties agree that the term "depending straight wall" should be given its plain and ordinary meaning. The term "depending" means "hanging or inclining downwards." 4 Oxford English Dictionary 475 (2d ed.1989). In this case, the term "depending" is understood in relation to the horizontal plane of the surface of the central portion. In addition, the term "straight" should be given its ordinary meaning. "Straight" means "not crooked; free from curvature, bending, or angularity." 16 Oxford English Dictionary 817 (2d ed.1989). Finally, the term "wall" in the claim was intended by Bailey to be given its ordinary meaning, and, therefore, I determine "wall" to mean "a perpendicular surface forming an enclosure or barrier." 19 Oxford English Dictionary 848 (2d ed.1989).

■ The gravamen of the dispute between the parties is the phrase "bridging the interior ends of said tear impressions." While both parties agree that I should construe the word "bridging" according to its ordinary meaning, they cannot agree on what that definition requires. Dart argues that the word "bridging" requires that the tear impressions physically extend to touch or intersect the essentially vertical depending straight wall hinge element. Bailey argues that the term "bridging" does not require that the tear impressions touch the wall of the hinge element.

Bailey's expert, Dr. Grossman, found support for Bailey's construction in the specification, which describes an embodiment in which the tear impressions "can run to or into" the wall. The use of the permissive word "can," rather than a mandatory word such as "must," suggested to Dr. Grossman that the tear impressions may run to or into the wall, but are not

required to do so. The magistrate judge adopted Bailey's position:

> Examining the term bridging, the ordinary meaning of bridging does not require that the component being bridged, i.e., the interior ends of the tear impressions, touch or physically intersect with the component doing the bridging, i.e., the vertical depending straight wall. Ordinarily, the term bridge simply means "a structure carrying a pathway or roadway over a depression or obstacle." Such a definition does not directly imply, let alone require, that the obstacle being bridged intersect the actual bridge. To create this implication, let alone this requirement, would necessitate more specific and particular language in the claim. For example, claim 1 could describe the vertical depending straight wall as "bridging and touching the interior ends of the tear impressions ." Unfortunately for Dart, however, claim 1 does not contain such language but simply uses the term bridging.

*See Bailey I,* 980 F.Supp. at 578.

Upon reconsideration, I conclude that one skilled in the art would understand the term "bridging" to require the tear impressions to intersect or touch the essentially vertical depending straight wall. The verb form "bridging," as opposed to the noun examined by the magistrate judge, is defined:

> "22. to make a bridge or passage over; span: *The road bridged the river.* 23. to

join by or as if by a bridge: *a fallen tree bridging the two porches."*

Random House Webster's Unabridged Dictionary 261 (2d ed.1997).[9] Bailey's counsel disagrees, however, that "bridging" *requires* the joining of the tear impressions. Instead, Bailey's counsel argued at the hearing that joining was permissible, but all that is required by the '167 patent is that the vertical wall be "between" the tear impressions. Tr. 5, p. 70, l. 4–6.[10] Bailey's argument seeks to limit the word "bridging" to simply mean "spanning." While it is true that all bridges must span whatever it is they bridge (e.g., the river or the area between the two porches), it is also true that bridges must touch either side of what it is they bridge (e.g., the banks of the river or the porches). The most accurate way of expressing these truths is the verb "to join." Thus, the essentially vertical depending wall must "join" the pair of spaced apart tear impressions.

Therefore, in the case of one continuous line, the tear impression must touch or intersect the vertically depending straight wall. When the tear impression consists of a plurality of spaced-apart, relatively short impressions, a small space separating the wall from the last impression may be appropriate. Such a space must be small enough that the tear impression retains its essential feature of touching the wall, bearing in mind that the tear impression is formed by a series of intermittent impressions and spaces.[11]

**9.** I have relied generally on the Oxford English Dictionary for the definition of disputed terms. Here, I rely on the Random House Webster's Unabridged Dictionary because that was the source provided to me by Bailey. Bailey's Brief After Markman Hearing, Ex. 2.

**10.** The following conversation took place at the *Markman* hearing:

> The Court: [The wall] may join, but it may just be between?
> Counsel: Yes, exactly right.
> Tr. 5, p. 70, l. 4–6.

**11.** This conclusion is consistent with my ruling above that a small space may exist between the first impression and the outer edge. Both of these rulings recognize that the "tear impression" consists of "impressions" and

## SUMMARY

In summary, and as elaborated upon above, I construe the disputed terms as follows:

**(1) "a central portion adapted to nest within and below the rim of a container:"**

Structurally, the container lid comprises a conventional relatively flat central portion adapted to nest within and somewhat below the rim of the container. The central portion does not include the structures within the rim-engaging means, such as a vent cap and any protrusions. Therefore, those structures found molded-into the central portion need not sit below the horizontal plane formed by the rim of the container.

**(2) "a pair of spaced apart tear impressions extending inwardly from the edge of the container lid."**

Tear impressions may appear in two basic forms, one being a single, continuous line and the other being a plurality of spaced-apart, relatively short impressions. Tear impressions must be physical, visible features on the lid, that may have some variation in width. Looking at a lid before it is torn open, tear impressions must predetermine and define a line. A "line" is very narrow in proportion to its length, and can be straight or curved. The line formed by the tear impressions necessarily has some width, although the tear impressions cannot be so wide that they lose their essential characteristic of predetermining and defining a line, and that they foster the failure of the plastic material along predetermined lines.

The word "edge" in claim 1 refers to the outer edge of the container lid. In the case of a plurality of spaced-apart, relatively short impressions, the choice of the word "from" in claim 1 does not exclude allowance for a small space between the outer edge of the container lid and the first impression leading therefrom. However, such a space must be small enough that the tear impression retains its essential feature of extending inwardly from the outer edge of the container lid. In addition, the description accorded the plurality of spaced-apart relatively short impressions also leaves room for a variation in the shape of the impressions. For instance, the impressions need not be dashes or dots, but could take the form of a variety of shapes, so long as the shapes maintain the essential characteristic of defining a line. In the case of one continuous line, the impression must begin at the outer edge and travel inwardly to the tear stop means.

**(3) "and retainer means comprising at least one protrusion molded into the surface of the central portion of the lid opposite said access strip"**

A "protrusion" is a different structure from a "vent cap." A retainer means comprising "at least one protrusion" requires one protrusion, but not only a single protrusion. The retainer means must consist of at least one protrusion and some other structure in addition to the protrusion.

**(4) "essentially vertical depending straight wall bridging the interior ends of said tear impressions"**

"Essentially vertical" means "vertical or a few degrees from vertical." The

---

"spaces" between them. Thus, the tear impression does not necessarily begin at the first "impression" or end at the last "impression."

Instead, there may be a small space beginning or ending the structure termed "tear impression."

term "depending" means "hanging or inclining downwards" from the horizontal plane of the surface of the central portion of the container lid. "Straight" means "not crooked; free from curvature, bending, or angularity." The term "wall" means a "perpendicular surface forming an enclosure or barrier." For the essentially vertical depending straight wall to be "bridging" the interior ends of the tear impressions, the tear impressions must intersect or touch the essentially vertical depending straight wall. Therefore, in the case of one continuous line, the tear impression must touch or intersect the vertically depending straight wall. When the tear impression consists of a plurality of spaced-apart, relatively short impressions, a small space separating the wall from the last impression may be appropriate. Such a space must be small enough that the tear impression retains its essential feature of touching the wall, bearing in mind that the tear impression is formed by a series of intermittent impressions and spaces.

In light of the foregoing discussion, it appears that another final pretrial conference is appropriate. The clerk shall schedule such a conference.

SO ORDERED.